Eric Stephenson (9779)
STEPHENSON LAW FIRM
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
(844) 529-2112
eric@utahjustice.com

*Attorney for Petitioners*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SCOTT RILLEY, MICHELLE KUNZA, KENDRA BUETTNER, JONATHAN ALDRICH, AND VENUS COLQUITT-MONTGOMERY, | **DECLARATION OF JOHN G. ALBANESE IN SUPPORT OF MOTION TO ENFORCE SUBPOENA** |
| Petitioners, | |
| vs. | Case Number: |
| MONEYLION OF UTAH LLC, | Judge: |
| Respondent. | |

I, John G. Albanese, hereby declare as follows:

1.      I am one of Movants & Plaintiffs' Counsel in the underlying D. Minn. matter.

2.      I submit this Declaration in support of Plaintiffs' Motion to Enforce Subpoena.

3.      In discovery, Defendants produced a spreadsheet showing the leads that were sold, when those leads were sold, and to which lender those leads were sold.

4.      Defendants have asserted that after a lead is sold, they have no knowledge and possess no information about whether a loan transaction is consummated, the terms of any transactions, or the payments made on any transaction.

5.      Based on Plaintiffs' counsel's investigation, it appears that MoneyLion of Utah, LLC is not licensed to make loans by the state of Minnesota.

6.      Based on Defendants' spreadsheet, MoneyLion began purchasing Minnesota leads from Defendants in 2016, and was sold 32 Minnesota leads in the relevant time period.

7.     Plaintiffs' Counsel have reviewed all documents produced by Defendants to date, and it does not appear that Lead Purchase Insertion Order that governed the sale of Plaintiff Aldrich's lead from Defendants to MoneyLion has not been produced to date.

8.     Attached as Exhibits are true and correct copies of the following:

**Exhibit A:**     Second Amended Class Action Complaint;

**Exhibit B:**     Plaintiffs' Amended Subpoena to MoneyLion;

**Exhibit C:**     Plaintiffs' Memorandum in Support of Motion for Class Certification;

**Exhibit D:**     MoneyLion's Objections to Plaintiffs' Subpoena;

**Exhibit E:**     Plaintiffs' Initial Subpoena to MoneyLion;

**Exhibit F:**     MoneyLion's Objections to Plaintiffs' Amended Subpoena;

**Exhibit G:**     April 4, 2018 Correspondence to MoneyLion's Counsel; and

**Exhibit H:**     Aldrich Payment History, PLF-0002538.


The foregoing statement is made under penalty of perjury and is true and correct to the best of my knowledge and belief.


DATED 9/24/2018                         /s/ John G. Albanese
                                        John G. Albanese

# Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Scott Rilley, Michelle Kunza, Venus Colquitt-Montgomery, Jonathon Aldrich, and Kendra Buettner, *on behalf of themselves and those similarly situated*,

        Plaintiffs,

v.

MoneyMutual, LLC, Selling Source, LLC, and PartnerWeekly, LLC,

        Defendants.

Case No. 16-cv-04001-DWF-LIB

**SECOND AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs Scott Rilley, Michelle Kunza, Venus Montgomery, Jonathon Aldrich, and Kendra Buettner ("Plaintiffs"), by and through their attorneys bring this class action complaint against MoneyMutual, LLC ("MoneyMutual"), Selling Source, LLC ("Selling Source") and PartnerWeekly, LLC ("PartnerWeekly") (collectively "Defendants"), alleging as follows:

### INTRODUCTION

1.    This is a consumer class action against Defendants that arrange payday loans between Minnesotans and payday lenders that violate virtually every substantive provision of Minnesota's payday loan laws.

2.    Defendants' loans violate Minnesota law because: they charge interest rates far in excess of the rates allowed under Minnesota law (up to 1,304%); neither Defendants nor the payday lenders are licensed to do business or operate as payday

lenders in Minnesota; and Defendants fail to make loan disclosures required under Minnesota law.

3.      Defendants are well-aware that they are extending payday loans to Minnesotans, as they advertise extensively in Minnesota, including through MoneyMutual and the website www.moneymutual.com, using the celebrity spokesperson Montel Williams, and require loan applicants to disclose their home address when applying for the loan.  Despite reaching out to Minnesotans to offer and arrange payday loans, Defendants make no effort to comply with Minnesota's payday loan laws.

4.      Defendants even broker loans to Minnesotans with payday lenders who have been ordered to cease and desist from lending to Minnesotans by Minnesota regulators. Minnesotans have been harmed by Defendants' illegal practices.

5.      Minnesotans have paid exorbitant and usurious interest and have been trapped in the "cycle of debt" that Minnesota's restrictions on payday loans were designed to prevent.

6.      Despite the blatant illegality of their lending, Defendants have falsely represented on moneymutual.com that their loans comply "with all applicable state and federal laws."

7.      Defendants' conduct violates Minn. Stat. § 47.601, Minnesota's Uniform Deceptive Trade Practices Act (Minn. Stat § 325D.44), Minnesota's Consumer Fraud Act (Minn. Stat. §§ 325F.69 and 8.31), and Minnesota's False Statement in Advertising Act (Minn. Stat. §§ 325F.67 and 8.31).  In addition, by arranging loans to Minnesotans that blatantly and obviously violate Minnesota law, Defendants breached basic common law

duties they owed to their customers, aided and abetted the illegal payday lenders, and engaged in a civil conspiracy to violate Minnesota law. Defendants were also unjustly enriched by their illegal conduct.

8. Plaintiffs assert claims on behalf of a class of all Minnesotans affected by Defendants' violations of law for damages, injunctive relief, fees and costs.

## THE PARTIES

9. Plaintiff Michelle Kunza is a natural person residing in Otter Tail County, Minnesota.

10. Plaintiff Scott Rilley is a natural person residing in Dakota County, Minnesota.

11. Plaintiff Venus Colquitt-Montgomery is a natural person who resided in Minnesota at the times relevant to this complaint.

12. Jonathon Aldrich is a natural person residing in Otsego, Minnesota.

13. Kendra Buettner is a natural person residing in Minneapolis, Minnesota.

14. Defendant MoneyMutual, LLC is a Nevada limited liability company that conducts substantial business in Minnesota by advertising in Minnesota and doing business with Minnesotans. MoneyMutual is a "consumer short term lender" as defined by Minnesota law because it is "an individual or entity engaged in the business of making or arranging consumer short-term loans" and is not "a state or federally chartered bank, savings bank, or credit union." Minn. Stat. § 47.601, subd. 1(e).

15. Defendant Selling Source, LLC is a Delaware limited liability company with its principal place of business in Las Vegas, Nevada. Selling Source is a "consumer

short term lender" as defined by Minnesota law because it is "an individual or entity engaged in the business of making or arranging consumer short-term loans" and is not "a state or federally chartered bank, savings bank, or credit union."  Minn. Stat. § 47.601, subd. 1(e).

16.     Defendant PartnerWeekly, LLC is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  PartnerWeekly is a wholly-owned subsidiary of Selling Source.   PartnerWeekly is a "consumer short term lender" as defined by Minnesota law because it is "an individual or entity engaged in the business of making or arranging consumer short-term loans" and is not "a state or federally chartered bank, savings bank, or credit union."  Minn. Stat. § 47.601, subd. 1(e).

## JURISDICTION

17.     This case was originally filed in Dakota County District Court for the state of Minnesota.  Defendants removed this case asserting jurisdiction under 28 U.S.C. §§ 1441, 1331, 1367 and 1332.

18.     Venue is proper in this District because a substantial part of the events giving rise to the claims occurred in this District.

## MINNESOTA'S EXTENSIVE REGULATION OF PAYDAY LENDING

19.     Payday loans are highly regulated in Minnesota (and most other states) because such loans can trap vulnerable borrowers in a downward spiral of debt, with potentially disastrous consequences for borrowers and the communities in which they live.

20.     The Minnesota Legislature substantially amended Minnesota's Payday

Loan Laws in 2009 to clarify that the laws applied to payday loan transactions consummated online, to provide for a private cause of action, and to add substantial statutory penalties and fee-shifting provisions. *See* Minn. Stat. §§ 47.60 and 47.601. These statutes refer to payday loans as "consumer small loans" and "consumer short term loans." Minn. Stat. § 47.60, subd. 1(a); Minn. Stat. § 47.601, subd. 1(d).

21.     The amended statutes place strict caps on the amount of interest and fees that such lenders can charge. *Id.* For short term loans under $350, the fee and interest caps are:

| $0-$50 | $5.50 |
|---|---|
| $50-$100 | 10% of loan proceeds plus $5 administrative fee |
| $100-$250 | 7% of loan proceeds with a minimum of $10 plus $5 administrative fee |
| $250-$350 | 6% of loan proceeds with a minimum of $17.50 plus $5 administrative fee |

22.     For loans above $350 and less than $1000, Minnesota law caps the annual interest rate at 33%, and caps administrative fees at $25. *See* Minnesota Attorney General, Beware of Internet Loans, attached as Exhibit A.

23.     Additionally, consumer short-term lenders must be licensed by the Minnesota Department of Commerce before lending to or arranging loans to Minnesotans. Minn. Stat. § 47.601, subd. 2(a)(3)(i).

24.     Minnesota law further prohibits loan contracts from containing provisions "selecting a law other than Minnesota under which the contract is construed or enforced," "choosing a forum for dispute resolution other than the state of Minnesota," or "limiting class actions against a consumer short-term lender." Minn. Stat. § 47.601 subd. 2(a)(1)-

5

(3).

25.     Minn. Stat. § 47.601, subd. 2(c) also requires consumer short term lenders to make disclosures.  It states:

> A consumer short-term loan lender must furnish a copy of the written loan contract to each borrower.  The contract and disclosures must be written in the language in which the loan was negotiated with the borrower and must contain:
>
> (1) the name; address, which may not be a post office box; and telephone number of the lender making the consumer short-term loan;
> (2) the name and title of the individual employee or representative who signs the contract on behalf of the lender;
> (3) an itemization of the fees and interest charges to be paid by the borrower;
> (4) in bold, 24-point type, the annual percentage rate as computed under United States Code, chapter 15, section 1606; and
> (5) a description of the borrower's payment obligations under the loan.

26.     A consumer short term lender who violates the statute is liable to the borrower for "all money collected or received in connection with the loan," actual damages, statutory damages of up to $1,000 per violation, costs and attorneys' fees, and injunctive relief.  *Id.* § 47.601, subd. 6.

27.     The State of Minnesota has devoted considerable resources trying to combat payday lenders who charge usurious interest rates and otherwise violate Minn. Stat. §§ 47.60 and 47.601.

28.     After the Minnesota Legislature amended Minnesota's payday lending laws in 2009, the Minnesota Attorney General's Office brought nine civil enforcement actions

against online lenders who flouted Minnesota's payday loan laws, which resulted in millions of dollars in statutory damages awarded to the State.[1]   The Minnesota Attorney General's Office also engaged in public education efforts regarding the dangers of online payday loans, and issued a publication warning the public about such lenders.   *See* Exhibit A.   In addition, the Minnesota Department of Commerce initiated at least twenty-two administrative actions against online payday lenders who failed to obtain the required license and otherwise violated Minnesota law regarding payday loans.   *See* Exhibit B.

29.    As one of the biggest and most prominent brokers of online payday loans, Defendants are aware or should be aware of Minnesota's strict payday loan laws and the extensive regulatory action taken by Minnesota regulators.   Defendants, however, thumb their noses at these regulators, paying no heed to Minnesota's licensure requirements and even subjecting Minnesotans to loans with payday lenders who have been ordered to cease and desist from lending to Minnesotans.   For example, Defendants brokered a payday loan with one of the plaintiffs in this action and Bottom Dollar Payday after it had been ordered to cease and desist from lending to Minnesotans by the Minnesota Department of Commerce.   *See* Exhibit C.

---

[1]  *State of Minnesota v. Jelly Roll Financial, LLC*, No. 19HA-CV-10-1703 (Dakota County, Mar. 31, 2010); *State of Minnesota v. Eastside Lenders, LLC*, No. 19HA-CV-10-1705 (Dakota County, Mar. 31, 2010); *State of Minnesota v. Global Payday Loan*, LLC, No. 27-CV-10-6381 (Hennepin County, Mar. 31, 2010); *State of Minnesota v. Silverleaf Management d/b/a Upfront Cash*, No.330-cv-11-305 (Kanabec County, Sept. 6, 2011); *State of Minnesota v. Flobridge Group LLC*, No. 62-CV-11-7171 (Ramsey County, September 6, 2011); *State of Minnesota v. Sure Advance LLC*, No. 27-CV-11-18350 (Hennepin County, Sept. 6, 2011); *State of Minnesota v. Integrity Advance*, No. 62-CV-11-7168 (Ramsey County, Sept. 6, 2011); *State of Minnesota v. CashCall Inc.*, No. 27-CV-13-12740 (Hennepin County, July 11, 2013).

30.     Defendants' illegal lending practices have resulted in litigation and enforcement actions in other states.  For example, it has been reported that the Consumer Financial Protection Bureau, which has regulatory authority over payday lenders, is investigating Defendants.

31.     Another example is that the Pennsylvania Department of Banking, which administers and enforces Pennsylvania's usury and lender licensing laws, issued an Order against Defendants alleging that Selling Source "engaged in unlicensed activity by assisting lenders to make payday loans to Pennsylvania residents."  *See* Exhibit D.  This action resulted in a Consent Agreement and Order wherein Defendants agreed to pay a fine, to cease advertising in Pennsylvania, and to cease doing business with Pennsylvanians. *Id.*

32.     Similarly, the New York Department of Financial Services also entered into a Consent Order with Defendants under which Defendants agreed to, among other things, pay a $2.1 million civil penalty and state in all promotional materials that Defendants' "service is not available in New York or to New York borrowers due to interest rate limits under New York law."  *See* Exhibit E.

33.     And, the Oregon Department of Consumer and Business Services found that Selling Source, doing business as MoneyMutual, violated Oregon law "by conducting a business in which it acted as an agent, broker or facilitator of payday loans … without first obtaining a license," and ordered Selling Source to pay a civil penalty and cease and desist its, and its affiliates', violations of Oregon law.  *See* Exhibit I.

34.     The Illinois Attorney General has also sued MoneyMutual for illegal,

unlicensed payday lending.

35.     In addition, customers have sued Defendants privately in class action lawsuits asserting usury and RICO claims against Defendants in other states for the engaging in same practices that are the subject of this action in other states.  *Gilbert v. MoneyMutual, LLC, et al.*, No 4:13cv-1171 (N.D. Cal. Feb. 11, 2013)*; Pham. v. JPMorgan Chase Bank, N.A., et al.*, No. RG12652919 (Alameda County Sup. Ct. Oct. 22, 2012).

## **DEFENDANTS' ILLEGAL PAYDAY LOANS**

36.     Selling Source operates a payday and other short-term lending lead generation business through a number of wholly-owned subsidiaries, including MoneyMutual and PartnerWeekly.  Selling Source is the sole managing member of PartnerWeekly and MoneyMutual.

37.     PartnerWeekly is Selling Source's primary operating subsidiary in connection with payday loans and other short-term lending products, and acts as Selling Source's agent in running www.moneymutual.com.

38.     MoneyMutual is a wholly-owned subsidiary of Selling Source.  It was established to hold the moneymutual.com website.  PartnerWeekly is generally responsible for operations concerning the moneymutual.com website.

39.     Selling Source also owns specialty consumer reporting agency DataX, LTD ("DataX") which provides specialty credit reports that are used by and sold to payday lenders.

40.     Defendants advertise extensively on television broadcast into Minnesota,

using the celebrity Montel Williams as the spokesperson for MoneyMutual.

41.     Defendants have specifically targeted the Minnesota market by purchasing Google AdWords campaigns for "payday loans Minnesota" and "payday loans Minneapolis."

42.     Minnesotans who apply for a loan on moneymutual.com are required to fill out an application that includes their address and how much the borrower would like to borrow.   While Defendants have the technological capability to inform Minnesota borrowers that they do not do business in Minnesota, they choose not to exercise that capability and to instead engage in business transactions involving Minnesotans.

43.     After receiving information about the borrower's identity, address, and requested loan amount, Defendants match Minnesotans with online payday lenders based on the information provided in the application.

44.     Specifically, PartnerWeekly has entered into Lead Purchase Agreements with lenders which provide that the contracting payday lenders will be offered and can acquire leads from PartnerWeekly identifying persons interested in obtaining a payday loan.

45.     The leads offered by PartnerWeekly are created with information submitted by consumers both to the moneymutual.com website and to other websites. PartnerWeekly and Selling Source earn revenue from the sale of these leads.

46.     The MoneyMutual website encourages borrowers to obtain a lender through the use of the website.

**If MoneyMutual isn't a lender, why should I use your web site?**

> You can find a lender for free! Instead of waiting in line or searching for lenders, our web site can help make the process finding a lender who can meet your needs, faster and easier! Instead of spending hours applying individually on several websites, request a loan from multiple lenders at once by visiting Money Mutual online marketplace.

https://moneymutual.com/questions

47. After Defendants match Minnesotans with online payday lenders, Defendants direct the borrower to the online payday lenders' websites, where the loan transaction is finalized.

48. Defendants use a Trident Secure Data system to track their operations, including tracking the identities of the lenders which ultimately make loans to Minnesotans. Defendants use this tracking data to calculate the fees lenders owe Defendants.

49. Defendants receive fees from the online payday lenders in connection with the loans that result from the leads they sell.

50. Defendants' loans routinely charge interest rates far in excess of those allowed under Minnesota law. The moneymutual.com website indicates that "the typical representative APR range" of its online payday lenders "is somewhere between 261% and 1304% for a 14 day loan." These APRs are far in excess of the interest payday lenders may charge under Minnesota law. *See* Minn. Stat. § 47.60, subd. 2; Minn. Stat. § 47.601, subd. 2(a)(3)(ii).

51. Defendants' loans routinely contain other terms and provisions that make the loans invalid under Minnesota law, including illegal purported class action waivers and illegal choice of law provisions.

52.     Defendants fail to make required the disclosures required by Minn. Stat. 47.601, subd. 2(c) in connection with its loans.

53.     As a result of the unlicensed payday lenders, illegal rates, illegal terms, and lack of disclosures, Defendants' loans are per se illegal and are void *ab initio*. *See* Minn. Stat § 47.601, subd. 6(b)(1).

54.     The loans Defendants arrange are illegal, and the representations on moneymutual.com are false and misleading.

55.     Until at least April 30, 2016, Defendants asserted that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws," *See* Exhibit H at page 4.  This statement was false and misleading because Defendants arranged for loans that did not comply with Minnesota law.  Defendants no longer stand by this statement and have removed it from the moneymutual.com website.

56.     Defendants' loans do not abide "by all applicable state and federal laws."

57.     Defendants and their lenders are not licensed to operate in Minnesota.

58.     The Minnesota Department of Commerce publishes a list online of the licensed payday and consumer small loan lenders in Minnesota that is available online at http://mn.gov/commerce/consumers/file-a-complaint/inquiries-and-information/consumer-small-loan.jsp, so it would be easy for Defendants to determine if their loans involve payday lenders who are licensed to operate in Minnesota.  Rather than performing this simple task, Defendants choose to ignore Minnesota law.

59.     Defendants asserted to consumers that "using an APR to represent the fees

is not only inaccurate, but also fairly misleading," Exhibit H at page 2. This statement is false and misleading as it encourages consumers to ignore the usurious interest rates on Defendants' loans.

60.     Until at least April 30, 2016, the moneymutual.com website claimed that Montel Williams "endorsed MoneyMutual because it helps provide people who have no other short-term cash alternatives, access to lenders who offer payday loans and cash advances" and that he "believes that getting a short term cash loan from MoneyMutual's network of participating lenders can help provide the immediate assistance to avoid expensive fees." Again, Mr. Williams' endorsement has been modified and the website currently states that Mr. Williams "endorsed MoneyMutual because it allows people who have no other short-term cash alternatives to find lenders who offer payday loans and cash advances" and that he "believes that finding a short term cash lender through MoneyMutual's marketplace can help provide the immediate assistance to avoid expensive fees."

61.     Until at least April 30, 2016, Montel Williams was quoted on moneymutual.com as stating, "MoneyMutual's online lending network is the only source you can trust for finding a payday loan quickly and easily." Mr. Williams has re-characterized his promise to remove reference to MoneyMutual's online "lending network" and he is now quoted on the moneymutual.com website as stating, "MoneyMutual's online marketplace is a resource you can trust for finding a short term lender quickly and easily."

62.     The website further states that Montel Williams "only endorses products

that help people live better in all aspects of their lives."

63.    Defendants received or became aware of numerous complaints from aggrieved Minnesota consumers struggling under the rates, fees, and repayment schedules demanded by MoneyMutual's network of lenders.

64.    A former Selling Source CEO noted at least "55% of the people that come into MoneyMutual are 'repeat clients,'" that its lender clients reported a "60 to 70%" repeat borrower rate, and that special targeting of repeat, "Gold" customers could generate additional revenue for Selling Source if those customers took out additional loans to pay off prior loans.

65.    Indeed, after a consumer takes out one loan through moneymutual.com, Defendants send follow-up emails soliciting the consumer to take out other loans through moneymutual.com.   Defendants also send emails encouraging consumers to finish incomplete applications.

66.    Each of the lenders in Defendants' network benefits from the presence of the other lenders in the network. First, the lenders all benefit from the illusion of legitimacy that they are provided by Defendants' claim that it only works with reputable lenders who follow the law. Second, the lenders benefit from Defendants' claim that consumers using its website will experience efficiencies because they can apply for loans from multiple lenders at the same time, rather than having to fill out numerous individual-lender-specific applications. Third, the lenders benefit from their common affiliation with Selling Source and their ability to use the credit reporting services of DataX because they are able to share information with one another about individual

borrower's loan application and loan payoff histories, thereby being able to assess risk through data-sharing facilitated by DataX. Fourth, the presence of numerous lenders in the network allows each individual lender access to a more diverse portfolio of potential customers than it would be able to garner on its own, allowing each lender to diversify its own portfolio of loan risks. Finally, the lenders in Defendants' network benefit from one another's loans because payday loan borrowers often take out a new loan to pay off a past payday loan. Defendants' centralized lead generation and use of a network of lenders allows the lenders to steer this repeat-business to one another.

## PLAINTIFF SCOTT RILLEY'S ILLEGAL PAYDAY LOAN

67.     On or about April 16, 2013, Scott Rilley applied for a payday loan on moneymutual.com using his personal computer in Apple Valley, Minnesota.

68.     In addition to using his personal computer, Rilley provided his Minnesota home address in Dakota County in the loan application.  Defendants matched Rilley with Bottom Dollar Payday, a/k/a BD PDL Services ("Bottom Dollar Payday").  A copy of its website is attached as Exhibit G.

69.     Bottom Dollar Payday is not licensed to operate as a payday lender in Minnesota and was not so licensed at the time of Rilley's loan.

70.     On April 16, 2013 Defendants, through MoneyMutual, sent Rilley the following email:







**From:**        Customer Service <no-reply@moneymutual.com>
**Sent:**        Tuesday, April 16, 2013 11:18 AM
**To:**          SCOTT RILLEY
**Subject:**     Congratulations

You Have Been Matched With a Lender

**MoneyMutual**®
Designed With You In Mind.                          Exclusively For: | SCOTT RILLEY

### Congratulations!

Dear SCOTT,

Congratulations! You have been matched with BD PDL Services, one of the lenders in the MoneyMutual network. You can contact BD PDL Services directly at 888-702-4208 or by visiting their website.

**BottomDollar**
P A Y D A Y

We're committed to providing the absolute best experience possible. That's why if you need to contact BD PDL Services again, they're only a click away by visiting their website.

We know that there are plenty of choices out there, and we're glad you chose MoneyMutual.

Sincerely,

Jay McMillan
MoneyMutual Customer Service

P.S. Remember, we're always here 24 hours a day, 7 days a week to help you get matched with a lender. If you should need to be matched for another short-term loan in the future, you can visit us online at the MoneyMutual website or call us at 800-809-2138.

\* \* \*

71.     Bottom Dollar Payday also charges far more interest than is allowed under Minnesota law, typically 30% of the principal balance every two weeks, which is an annual interest rate of 782%.  As explained in Bottom Dollar Payday's "FAQS":

> **How much is the first finance fee? How is it calculated?**
> The first finance fee is typically 30% of your principle loan amount.

Exhibit G at page 7.

72.     Bottom Dollar Payday's website then explains that it automatically "rolls over" or "renews" its payday loans so that the finance fee is incurred every two weeks. As it states on its website in the FAQs:

> **When do I repay? How do I repay? Do I have to repay it all at once?**
> Your repayment is the best part. The minimum required payment is the finance fee which is due on your next pay date. You have the option to pay only the finance fee or to pay the fee plus any increment of $10 or the principal in full. A finance fee will be due each due date that you carry a balance with us. You must phone us no less than three business days prior to your due date to set up a payment arrangement if you would like to pay off or pay down your loan. If we do not hear from you we will simply deduct the finance fee from your bank account. We also accept smaller principal payments on your due dates if your current budget does not allow for a full payoff. You get cash when you need it most and repay when you have it!

Exhibit G at page 6.  In other words, the "finance fee" discussed above is not a one-time fee charged by Bottom Dollar Payday.  It is a recurring fee that borrowers must pay every two weeks and does not include any part of the principal balance of the loan.  Instead, the 30% of the principal balance fee is *pure interest*, and the borrower must make special arrangements for additional payments to pay down the principal balance on the loan.  In addition to charging more interest than is permitted under Minnesota law, Bottom Dollar Payday's practice of repeatedly taking interest only payments violates Minnesota's limits on the terms of payday loans, and the prohibition on repeated "renewals" or "roll overs."

73.    Moreover, when Defendants arranged the Bottom Dollar Payday loan to Rilley, Bottom Dollar Payday was barred from lending to Minnesotans pursuant to a Cease and Desist Order from the Minnesota Department of Commerce.  *See* Exhibit C. According to the Cease & Desist Order, Bottom Dollar Payday is "not licensed by the Department in any capacity" and "does business out of San Jose, Costa Rica and Charlestown, Nevis over the website www.bottomdollarpayday.com." *Id.*

74.    The Order found that Bottom Dollar Payday had extended a $500 loan to a

Minnesotan and charged that Minnesotan an annual percentage rate of 608.33%.

75.     Based on these facts, the Order found that Bottom Dollar Payday's lending in Minnesota was illegal, and ordered it to cease and desist. *Id.*

76.     In addition to enforcement action taken by the Minnesota Department of Commerce, the State of Arkansas also banned Bottom Dollar Payday from extending loans to Arkansans.

77.     Not knowing that Bottom Dollar Payday was an illegal outlaw lender, Rilley received a loan from Bottom Dollar Payday.

78.     Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2 (c) to Rilley.

79.     On April 30, 2013, Bottom Dollar Payday debited $345 from Rilley's Minnesota bank account.

## PLAINTIFF MICHELLE KUNZA'S ILLEGAL LOANS

80.     In late 2010, Plaintiff Michelle Kunza was watching television at her home in Perham, Minnesota when she saw an advertisement for MoneyMutual on television. This advertisement featured the celebrity Montel Williams and offered payday loans.

81.     After seeing this commercial, Kunza called MoneyMutual from her Minnesota telephone number.  The representative who answered the phone instructed Kunza to go to MoneyMutual's website and fill out an application.

82.     As Kunza did not have a computer in her home, she went to the local library in downtown Perham and used the library computer to complete MoneyMutual's online application.

83.     After completing the application, including providing her home address in Perham, PartnerWeekly sold the information she had entered on moneymutal.com, including her address and requested loan amount, to a lender named CashCure.

84.     CashCure used Kunza's personal information to run a credit report on her using DataX.

85.     PartnerWeekly and Selling Source earned revenue from the sale of Kunza's information.  DataX earned revenue from the sale of Kunza's credit report.

86.     Shortly after Kunza completed the MoneyMutual application, a notification came up on the screen that indicated she had been approved for a $400 loan with a payday lender named "CashCure."

87.     CashCure is not and never has been licensed to operate as a payday lender in Minnesota and charged Kunza an annual interest rate of 1,209.06%.

88.     Ten days after Kunza received the loan, CashCure required her to pay a $106 finance charge.

89.     CashCure's loan contract authorized it to automatically renew the loan by debiting the finance charge of $106 from Kunza's bank account, and then to continue debiting this finance charge every two weeks up to four times before any of Kunza's payments would be used to pay down the principal balance of the loan.

90.     The loan agreement contained many terms that are illegal under Minnesota law, including:

     a.    An annual interest rate of more than 33%;

     b.    A clause choosing Delaware law as the applicable law; and

      c.     A clause purporting to waive the right to participate in a class action against CashCure.

91.     Kunza paid at least $790.20 to pay off her $400 loan from CashCure.

92.     As the Minnesota Department of Commerce explained to Kunza in a letter, CashCure was later ordered to cease and desist from lending to Minnesotans by the Minnesota Department of Commerce, and was fined $5,000 by the Department for lending to Minnesotans without a license.  Exhibit F.  The letter from the Department of Commerce further explained to Kunza that the loan from CashCure was "void" and suggested to her that she "inform your payday lender of [Minn. Stat. §§ 47.60 and 47.601] if they attempt to collect payment from you."  *Id*.

93.     After Kunza paid off her loan, she found that after paying the usurious interest rates on the loan, she was struggling to keep her head above water financially. Kunza felt she had no choice but to obtain another payday loan, so she contacted MoneyMutual.  MoneyMutual then matched Kunza with a payday lender named Sure Advance, LLC.  This payday lender was not licensed to operate in Minnesota, charged Kunza interest rates far in excess of those allowed under Minnesota law, and imposed other loan terms and conditions that violate the substantive prohibitions in Minn. Stat. § 47.60 and 47.601.  Sure Advance, LLC also pulled a credit report on Plaintiff Kunza from DataX.

94.     After making payments on this second illegal loan, Kunza became trapped in a downward financial cycle where she felt she had no choice but to take out additional payday loans to keep her bills paid, including the payments on her illegal payday loans.

Kunza took out additional payday loans, and her financial situation became unmanageable. Kunza experienced significant financial hardship as a result of these illegal payday loans, which began when she received illegal and usurious payday loans from Defendants.

95.    Sure Advance, LLC was later sued by the Minnesota Attorney General's Office for extending loans to Minnesotans that violate Minnesota law. That action ultimately resulted in a Consent Judgment wherein Sure Advance agreed to pay the State $760,000 for its illegal lending practices.

96.    In or around February 2011, Defendants also matched Kunza with Bottom Dollar Payday, who loaned $300 to Kunza. Bottom Dollar Payday credited Kunza's checking account with $300 on or around February 15, 2011.

97.    As described above, Bottom Dollar Payday was not licensed by the state of Minnesota and barred from lending in Minnesota.

98.    On March 4, 2011, March 18, 2011, April 1, 2011, and April 15, 2011, Bottom Dollar Payday debited $90 from Kunza's bank account.

99.    In September 2011, debt collector Total Recovery Solutions contacted Kunza repeatedly attempting to collect on the loan from Bottom Dollar Payday. The debt collector asserted that Kunza owed $640.50.

100.    After Kunza complained to the Department of Commerce, Total Recovery Solutions ceased collection activity on the loan and forgave the purported balance.

101.    Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Kunza for any of the loans they arranged.

## PLAINTIFF VENUS COLQUITT-MONTGOMERY'S ILLEGAL PAYDAY LOAN

102.    Using a computer in Delano, Minnesota, Plaintiff Venus Colquitt-Montgomery applied for a payday loan on Defendants' website in or around May 2017, entering in her Minnesota address and contact information.

103.    Defendants matched Colquitt-Montgomery with FSST Financial Services d/b/a Rushmore Financial.  Defendants sent her an email stating that "a lender is willing to work with you" and provided the contact information for Rushmore Financial with a link where she could "connect with" Rushmore Financial.

104.    Defendants also sent Colquitt-Montgomery another email with the subject line "Welcome to MoneyMutual" which thanked her for choosing the MoneyMutual online marketplace.

105.    Rushmore Financial extended a $350 payday loan to Colquitt-Montgomery, which it deposited into her bank account on May 22, 2017.

106.    Rushmore Financial is not licensed to lend by the state of Minnesota and was not licensed at the time of Colquitt-Montgomery's loan.  Rushmore Financial charges more than twice the amount of interest than what is permitted under Minnesota law.

107.    Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Colquitt-Montgomery in connection with this payday loan.

108.    From June 7, 2017 through November 1 2017, Rushmore made automated

withdrawals from Colquitt-Montgomery's Minnesota bank account totaling $972.13.

109.    Per its website, Rushmore Financial charges annual interest rates of up to 1505.62% and finance charges of $33 per $100 dollars borrowed.

110.    Despite all of these payments, Rushmore Financial continued to assert that Colquitt-Montgomery owed a further balance on her loan.   Only after Colquitt-Montgomery complained to the Minnesota Attorney General did Rushmore Financial agree to waive the remaining balance on her loan.

## PLAINTIFF JONATHON ALDRICH'S ILLEGAL PAYDAY LOAN

111.    Using a computer in Minnesota, Plaintiff Jonathon Aldrich applied for a payday loan on moneymutual.com in or around January 2017, entering in his Minnesota address and contact information.

112.    Defendants matched Aldrich with "Lion Loans" aka MoneyLion of Utah LLC.

113.    Lion Loans is not licensed to make loans in the state of Minnesota and was not licensed at the time of the transaction.

114.    Lion Loans extended a $300 payday loan to Aldrich, which it deposited into his bank account on or around January 10, 2017.

115.    The stated annual interest rate on the loan was 645% with a total payment of $935.51.

116.    Starting on January 20, 2017, Lion Loans made automated withdrawals from Aldrich's bank of $71.98 every two weeks until Aldrich had paid the full amount of $935.51.

117.    Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Aldrich in connection with this payday loan.

## PLAINTIFF KENDRA BUETTNER'S ILLEGAL PAYDAY LOAN

118.    Using a computer in Minnesota, Plaintiff Kendra Buettner applied for a payday loan on moneymutual.com in or around March 2012, entering in her Minnesota address and contact information.

119.    Defendants matched Buettner with United Cash Loans.

120.    United Cash Loans is not licensed to make loans in the state of Minnesota and was not licensed at the time of the transaction.

121.    United Cash Loans was a lender owned and operated by notorious payday lender Scott Tucker.  Tucker's businesses were found to have been routinely arranging loans with interest rates of 600 percent to 700 percent. The FTC obtained a $1.3 billion judgment against Mr. Tucker and Mr. Tucker was convicted and sentenced for 16 years in prison for illegal lending.

122.    United Cash Loans extended a $150 payday loan to Buettner, which it deposited into her bank account on or around March 16, 2012.

123.    The loan automatically renewed every payday with a renewal fee.  After four renewals, the payments would increase to $50 plus the renewal fee.  Per United Cash Loans, a $300 loan with United Cash Loans had a $90 renewal fee.

124.    In 2013, the Minnesota Department of Commerce ordered United Cash Loans to pay a civil penalty of $5,000 in connection with a $300 payday loan made in 2010.  The Department of Commerce noted that United Cash Loans was not licensed in

any capacity found the violation to be "serious and reflect[ing] a disregard for Minnesota law."  Exhibit J.

125.   Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Buettner in connection with this payday loan.

## CLASS ACTION ALLEGATIONS

126.   Plaintiffs bring this action individually and as a class action pursuant to Federal Rule Civil Procedure 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

127.   The Class is defined as follows:

> All individuals residing in Minnesota who obtained a loan through moneymutual.com or any MoneyMutual-branded website from August 1, 2009 until the present or within the applicable limitations period.

128.   The individuals in the putative class are so numerous that joinder of all members is impracticable.  The number of class members exceeds 1,000.

129.   There are questions of law and fact common to the putative class that predominate over any questions solely affecting individual members, including, but not limited to:

a.   Whether Defendants are consumer short-term lenders;

b.   Whether Defendants' loans charged illegal interest and fees;

c.   Whether Defendants' loans involve unlicensed payday lenders;

d.   Whether Defendants' loans contain illegal terms;

e.   Whether Defendants made the required disclosures in connection with their

loans; and

      f.      The proper measure of damages for class members.

130.   Plaintiffs' claims are typical of those of the putative class.  Defendants' loans are routinely with unlicensed lenders, charge illegal interest and fees, contain numerous illegal terms, and fail to provide the required disclosures in connection with those loans.

131.   Given Plaintiffs' losses, Plaintiffs have the incentive and are committed to the prosecution of this action.  Plaintiffs will fairly and adequately protect the interests of the putative class and have retained as counsel a law firm that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel.  There are no known conflicts between Plaintiffs or class counsel and the class they seek to represent.

132.   This action is maintainable as a class action because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the putative class, which would establish incompatible standards of conduct for Defendants and would be a waste of limited judicial resources.

133.   This action is maintainable as a class action because questions of law and fact common to the putative class predominate over any questions affecting only individual members of the putative class and because a class action is superior to other methods for the fair and efficient adjudication of this action.

134.   This action is maintainable as a class action because Defendants have acted

on grounds generally applicable to the class, thus making injunctive relief and corresponding declaratory relief appropriate with respect to the class as a whole.

## COUNT ONE
### VIOLATION OF MINN. STAT. § 47.601
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

135.  Plaintiffs re-allege and incorporate all preceding paragraphs.

136.  Defendants are consumer short-term lenders as defined by Minn. Stat. § 47.601 subd. 1(d).

137.  Defendants are unlicensed, and their loans are with unlicensed lenders, those loans charge interest and fees in excess of that allowed, contain terms that are prohibited by Minn. Stat. § 47.601, subd. 2, and Defendants routinely failed to make the disclosures required by Minn. Stat. § 47.601, subd. 2(c).

138.  Plaintiffs and the Class have been harmed by Defendants' illegal business practices.

## COUNT TWO
### VIOLATION OF MINN. STAT. § 325F.69
### (Consumer Fraud Act enforced through Minn. Stat. § 8.31)
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

139.  Plaintiffs re-allege and incorporate all preceding paragraphs.

140.  In connection with the sale of illegal payday loans, Defendants act, use, or employ fraud, false pretenses, false promises, misrepresentations, misleading statements or deceptive practices with the intent that others rely thereon.

141. Examples of Defendants' false pretenses, false promises, misrepresentations, misleading statements or deceptive practice include, but are not limited to:

a. Asserting that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws," *See* Exhibit H at page 4;

b. Proclaiming that "using an APR to represent the fees is not only inaccurate, but also fairly misleading," thereby undercutting Minnesota law requiring that the APR be disclosed and causing confusion," *Id.* at page 2;

c. Engaging in the illegal conduct described in Count One.

142. Plaintiffs and the Class have been harmed as a result of the above practices.

**COUNT THREE**
**VIOLATION OF MINN. STAT. § 325D.44**
**(Uniform Deceptive Trade Practices Act)**
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

143. Plaintiffs re-allege and incorporate all preceding paragraphs.

144. Defendants:

a. Assert that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws," *See* Exhibit H at page 4;

b. Assert to consumers that "using an APR to represent the fees is not only inaccurate, but also fairly misleading,' *Id.* at page 2;

c. Engage in the conduct described in Count One.

145.   The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it has caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval and certification of Defendants' loans.   The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it has caused the likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with, or certification of Defendants' loans.   The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it constitutes Defendants representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; or that a person has a sponsorship, approval, status, afflation, or connection that the person does not have.

146.   The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it constitutes Defendants engaging in conduct which similarly creates likelihood of confusion or of misunderstanding.

147.   Plaintiffs and the Class have been harmed as a result of the above practices.

## COUNT FOUR
## VIOLATION OF MINN. STAT. § 325F.67
### (False Statement in Advertising Act enforced through Minn. Stat. § 8.31)
### (Asserted on behalf of the individual Plaintiffs and the Class against Defendants)

148.   Plaintiffs re-allege and incorporate all preceding paragraphs.

149.   With the intent to induce the public to use its services, Defendants advertise assertions, representations, and statements of fact which are untrue, deceptive, or misleading via television, the internet, and other public mediums.

150.    Examples of Defendants' untrue, deceptive, or misleading assertions, include but are not limited to:

a.    Asserting that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws," *See* Exhibit H at page 4;

b.    Asserting to consumers that "using an APR to represent the fees is not only inaccurate, but also fairly misleading," *Id.* at page 2;

151.    Plaintiffs and the Class have been harmed as a result of the above practices.

## COUNT FIVE
## UNJUST ENRICHMENT
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**
**(Pled in the alternative)**

152.    Plaintiffs re-allege and incorporate all preceding paragraphs.

153.    Defendants receive an impermissible and unearned financial gain from engaging in and facilitating illegal conduct.

154.    Defendants' actions and omissions are unjust and provide MoneyMutual with an impermissible financial gain.

155.    It would be inequitable for Defendants to retain profits, benefits, and other compensation from the practices alleged herein.

## COUNT SIX
## CIVIL CONSPIRACY
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

156.    Plaintiffs re-allege and incorporate all preceding paragraphs.

157.   Defendants conspired with each other and their network of illegal lenders to unlawfully provide illegal loans prohibited by Minnesota law.

158.  Plaintiffs and the Class were proximately harmed by Defendants' conspiracy.

## COUNT SEVEN
## AIDING AND ABETTING
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

159.   Plaintiffs re-allege and incorporate all preceding paragraphs.

160.   Defendants' network of lenders made illegal loans to Plaintiffs and the Class.

161.   Defendants knowingly assisted, encouraged, or otherwise aided and abetted these lenders in making illegal loans to Minnesotans.

162.   Plaintiffs and the Class were proximately harmed by Defendants' conduct.

## COUNT EIGHT
## ALTER EGO /PIERCING THE CORPORATE VEIL
**(Asserted in the alternative on behalf of the individual Plaintiffs and the Class against Selling Source and PartnerWeekly)**

163.   Plaintiffs re-allege and incorporate all preceding paragraphs.

164.   Defendant Selling Source is the alter ego of Defendant MoneyMutual.

165.   Selling Source has comingled its funds with that of MoneyMutual.

166.   Selling Source and MoneyMutual have failed to observe corporate formalities.

167.   Selling Source has treated MoneyMutual's assets as Selling Source's own assets.

168.   Upon information and belief, MoneyMutual is undercapitalized.

169.    The influence and governance of MoneyMutual is and has been with Selling Source, which has complete and absolute control of MoneyMutual.

170.    There is such a unity of interest and ownership between Selling Source and MoneyMutual that Selling Source and MoneyMutual are inseparable from each other and adherence to the fiction of the separateness of these entities would sanction fraud and promote a manifest injustice.

171.    Defendant Selling Source is the alter ego of Defendant PartnerWeekly.

172.    Selling Source has comingled its funds with that of PartnerWeekly.

173.    Selling Source and PartnerWeekly have failed to observe corporate formalities.

174.    Selling Source has treated PartnerWeekly's assets as Selling Source's own assets.

175.    Upon information and belief, PartnerWeekly has been undercapitalized.

176.    The influence and governance of PartnerWeekly is and has been with Selling Source, which has complete and absolute control of PartnerWeekly.

177.    There is such a unity of interest and ownership between Selling Source and PartnerWeekly that Selling Source and PartnerWeekly are inseparable from each other and adherence to the fiction of the separateness of these entities would sanction fraud and promote a manifest injustice.

178.    Based on the activities of Selling Source, the Court should pierce PartnerWeekly's and MoneyMutual's corporate veil.

## **PRAYER FOR RELIEF**

179.   WHEREFORE, Plaintiffs, on behalf of themselves and the putative class, pray for judgment against Defendants as follows:

a.   Certification of this action as a class action on behalf of the putative class;

b.   Designation of Plaintiffs as Class Representatives;

c.   Appointment of Berger & Montague, P.C. as class counsel;

d.   Judgment in favor of Plaintiffs on all counts;

e.   Declaration that the practices complained of herein are unlawful;

f.   Injunction requiring Defendants to cease and desist from engaging in these unlawful practices;

g.   Damages in the form of:

   i.   all money collected or received in connection with the loans;

   ii.   statutory damages of up to $1,000 per violation; and

   iii.   an award of pre-judgment and post-judgment interest as provided by law

h.   Disgorgement of all amounts received by Defendants for Class members' loans;

i.   An award of attorneys' fees and costs; and

j.   Any further remedy the Court may deem just and proper.

Date: March 20, 2018

BERGER & MONTAGUE, P.C.

/s/John G. Albanese
E. Michelle Drake #0387366
John G. Albanese #0395882
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Fax: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

Jeffrey Osterwise (*pro hac vice*)
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-300
Fax: (215) 875-4604
josterwise@bm.net

HEANEY LAW FIRM, LLC
Mark Heaney #0333219
13911 Ridgedale Drive, Suite 110
Minnetonka, MN 55305
Telephone: (952) 933-9655
Fax: (952) 544-1308
mark@heaneylaw.com

ATTORNEYS FOR PLAINTIFFS

Exhibit B



| | |
|---|---|
| **John G. Albanese** | |
| **WRITER'S DIRECT DIAL** | 612-594-5997 |
| **WRITER'S DIRECT FAX** | 612-584-4470 |
| **WRITER'S DIRECT E-MAIL** | jalbanese@bm.net |

March 9, 2018

<u>**VIA EMAIL & U.S. MAIL**</u>
Michael S. Poncin
Moss & Barnett
150 South Fifth Street, Suite 1200
Minneapolis, MN 55402
mike.poncin@lawmoss.com

      **RE:**    **Production Subpoena to MoneyLion of Utah LLC,** *Rilley v. MoneyMutual,*
               *LLC*, **Case No. 16-cv-04001-DWF/LIB (D. Minn.)**

Mike,

Despite our meet and confer efforts, I am disappointed that your client has not been able to meaningfully respond to the Subpoena.

To address some of your procedural concerns regarding the Subpoena, we are serving an amended Subpoena directed to "MoneyLion of Utah LLC," which requests the same documents as the original Subpoena directed to "Lion Loans".

As we have already met and conferred regarding the substance of the Subpoena, please be advised that if your client does not produce documents by the return date, we will move to enforce the Subpoena.

Sincerely,

*John Albanese*

John Albanese

Encl.



**Berger&Montague,P.C.**
ATTORNEYS AT LAW

John G. Albanese

| WRITER'S DIRECT DIAL | 612-594-5997 |
| WRITER'S DIRECT FAX | 612-584-4470 |
| WRITER'S DIRECT E-MAIL | jalbanese@bm.net |

March 9, 2018

<u>**VIA MESSENGER**</u>
MoneyLion of Utah LLC
c/o Registered Agent National Registered Agents, Inc.
1108 E South Union Ave
Midvale, UT 84047

        **RE:**    **Production Subpoena,** *Rilley v. MoneyMutual, LLC*, **Case No. 16-cv-04001-DWF/LIB (D. Minn.)**

To MoneyLion of Utah LLC:

Enclosed and served upon you is a Subpoena for Production of Documents, with Exhibit A. A copy of the operative complaint, and Protective Order in the above-referenced action are enclosed as well.

In lieu of making the production at the address noted on the face of the Subpoena, or if you have written objections to production, you may mail such documents to 43 SE Main Street, Suite 505, Attn: John Albanese, Minneapolis, MN 55414, or email them to jalbanese@bm.net. If you do intend to make the production at the address noted on the Subpoena, please contact my paralegal at jhibray@bm.net or 612-594-5995 to confirm.

Please include with your production an affidavit certifying that the documents produced are business records kept in the course of regularly conducted activity (FRE 803(6), 902(11)).

If you have any questions or concerns, please do not hesitate to contact me at 612-594-5997.

        Sincerely,

        John Albanese

Encl.

# UNITED STATES DISTRICT COURT
for the

District of Minnesota

| | |
|---|---|
| Scott Rilley, Michelle Kunza, Linda Gonzales, Michael Gonzales, | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.0:16-cv-04001-DWF-LIB |
| MoneyMutual, LLC, Selling Source, LLC, and PartnerWeekly, LLC | ) |
| _____ | ) |
| *Defendant* | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  MoneyLion of Utah LLC, c/o Registered Agent National Registered Agents, Inc., 1108 E South Union Ave., Midvale, UT 84047

*(Name of person to whom this subpoena is directed)*

[X] *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit A.

| Place:  Tempest Reporting, 175 S Main St, Suite 710, Salt Lake City, UT 84111 | Date and Time: March 30, 2018, 12:00 P.M. local time |
|---|---|

[ ] *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____3/9/2018_____

| *CLERK OF COURT* | | |
|---|---|---|
| | | *John Albanese* |
| _____ | OR | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  __Plaintiffs__
, who issues or requests this subpoena, are: John G. Albanese, Berger & Montague, P.C., 43 SE Main Street, Suite 505, Minneapolis, MN 55414; 612-594-5997; jalbanese@bm.net.

Civil Action No.  0:16-cv-04001-DWF-LIB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                        *Server's signature*

                                        _____
                                                        *Printed name and title*

                                        _____
                                                        *Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Exhibit A

<u>Instructions</u>

1.      In lieu of producing the documents at the address listed on the subpoena, you may mail the production to Berger & Montague, P.C., Attn: John Albanese, 43 SE Main Street, Suite 505, Minneapolis, MN, 55414, or email it to jalbanese.bm.net.

2.      Please include with your production an affidavit certifying that the documents produced are business records kept in the course of regularly conducted activity (FRE 803(6), 902(11)).

<u>Documents Requested</u>

1.      Copies of your loan agreements with Minnesota residents consummated at any time since August 1, 2009 where your contact with the Minnesota resident was initiated through or facilitated by a lead purchased from MoneyMutual, LLC, PartnerWeekly, LLC, or Selling Source, LLC.

2.      Documents evidencing the payment history for every loan transaction that you have consummated with Minnesota consumers since August 1, 2009 where your contact with the Minnesota consumer was initiated through or facilitated by a lead purchased from MoneyMutual, LLC, PartnerWeekly, LLC, Selling Source, LLC.  These documents should include sufficient information to identify the consumer's bank and bank account number involved in the loan transaction.

3.      Any agreements or contracts that have been in effect since August 1, 2009 with companies to which you furnish information regarding loans for the purposes of credit reporting or collection, including, but not limited to, DataX, FactorTrust, Microbilt, Clarity Services, and CoreLogic Teletrack.

4.      Your contracts with MoneyMutual, LLC, PartnerWeekly, LLC, or Selling Source, LLC that have been in effect since August 1, 2009.

5.      Communications with MoneyMutual, LLC, PartnerWeekly, LLC, or Selling Source, LLC since August 1, 2009 relating to this lawsuit, the legality of your loans, your legal status as a lender, any registrations or certifications held by you, any code of conduct applied by MoneyMutual or its affiliates to you, complaints regarding loans, any contracts or agreements between you and MoneyMutual, LLC, PartnerWeekly, LLC, or Selling Source, LLC, or any other lawsuits involving lending.

6.      Any lending licenses that you have obtained from the state of Minnesota since August 1, 2009.

7.      Agreements with any payment processors or banks that you have used to initiate ACH transactions on your behalf with Minnesota borrowers since August 1, 2009.

4/4/20

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

Scott Rilley, et al.
           Plaintiff,

v.

MoneyMutual, LLC, et al.
           Defendant,

Court File Number
0:16-cv-04001

**AFFIDAVIT OF SERVICE**

State of Utah
County of Salt Lake } SS

I, Wendy Neff, state that on Monday, March 12, 2018 at 9:02 AM I served the Letter; Subpoena,

Exhibit A upon MoneyLion of Utah LLC, therein named, personally at National Registered Agents,

Inc., 1108 E. South Union Ave., Midvale, UT 84047, by handing to and leaving with Holli Tharp,

Service of Process Specialist at National Registered Agents, Inc., the Registered Agent for

MoneyLion of Utah LLC, expressly authorized to accept service of process for same, a true and

correct copy thereof.

I declare under penalty of perjury that this information is true.

Dated:   03 / 12 /2018           Wendy Neff

* Service was completed by an independent contractor retained by Metro Legal Services, Inc.



Serial # BERMO 198108 5027

Re: 16307-0



legal support specialists since 1969

330 2nd Avenue South, Suite 150
Minneapolis, MN 55401
(800) 488-8994
www.metrolegal.com

-1-

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Scott Rilley, Michelle Kunza, Venus Colquitt-Montgomery, Jonathon Aldrich, and Kendra Buettner, individually and on behalf of the putative class,

        Plaintiffs,

v.

MoneyMutual, LLC, Selling Source, LLC, and PartnerWeekly, LLC,

        Defendants.

Case No. 16-cv-04001-DWF-LIB

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## INTRODUCTION

Through highly automated, standardized, and impersonal online interactions with Minnesota consumers, Defendants MoneyMutual, LLC, PartnerWeekly, LLC, and Selling Source, LLC ("Defendants") have arranged usurious short-term loans with unlicensed lenders in violation of Minnesota law, harming thousands of Minnesota consumers. Supported by a multifaceted marketing effort using celebrity spokesperson Montel Williams, Defendants encourage consumers in desperate financial circumstances to apply for a loan on MoneyMutual.com. After a consumer submits the online loan application, Defendants sell the consumer's information (or "lead") to their network of online lenders. If a lender purchases a consumer lead, the consumer is automatically redirected to the lender's website to consummate the loan transaction. Defendants' scheme has operated in substantially the same fashion since the inception of the MoneyMutual Website in 2009.

Based on these automated processes, Plaintiffs Scott Rilley, Michelle Kunza, Venus Colquitt-Montgomery, Jonathon Aldrich, and Kendra Buettner ("Plaintiffs") move to certify a class under Fed. R. Civ. P. 23(a) and (b)(3) of thousands of similarly situated Minnesotans who have been victimized by Defendants' scheme.  The proposed Class is sufficiently numerous, Plaintiffs' claims are typical of the proposed class members, and common questions of law and fact predominate over individualized issues.  Given the relatively small value of the claims, and the plethora of common issues, a class action is the superior method of adjudicating Plaintiffs' claims.  Plaintiffs understand their obligations as putative Class Representatives and their experienced Counsel are more than adequate to represent the proposed Class' interests.  A class of California consumers making similar claims against Defendants was certified recently, and the result should not be different here.  *Gilbert v. MoneyMutual, LLC*, 318 F.R.D. 614 (N.D. Cal. 2016).

In the alternative, Plaintiffs seek to certify their claims for injunctive and declaratory relief under Fed. R. Civ. P. 23(b)(2).  Defendants continue to arrange loans to Minnesotans.  Plaintiffs seek a declaration that Defendants violated Minnesota law by arranging loans with unlicensed lenders.  Plaintiffs further seek an injunction requiring that Defendants cease doing business with Minnesotans until Defendants obtain the required Minnesota licenses and only sell Minnesota leads to lenders licensed by the state of Minnesota.

## BACKGROUND

### I.  Minnesota Regulates Online Short-Term Loans.

With the rise of online lending, consumers no longer have to visit a brick-and-mortar storefront to obtain short-term or payday loans.  Instead, consumers in dire financial

circumstances can apply over the internet for high-interest, small dollar, short-term loans from online lenders in an impersonal and automated fashion.  Online lending applications require the borrower to provide detailed information about their bank accounts and next payday.  Once a loan is consummated, the lender, using the Automated Clearing House ("ACH") network for electronic banking transactions, deposits the loan amount directly into the consumer's bank account.  The deposits often occur within 24 hours of the consumer making the loan application.  Using the same network, the lender then automatically debits loan payments and fees from the consumer's account.

Minnesota strictly regulates online short-term or payday lending because high-interest, short-term loans often target vulnerable borrowers and, left unregulated, can lead to disastrous results for the borrowers and the communities where they live.  Specifically, Minnesota regulates "consumer short-term loans," which are defined as "a loan to a borrower which has a principal amount, or an advance on a credit limit, of $1,000 or less and requires a minimum payment within 60 days of loan origination or credit advance of more than 25 percent of the principal balance or credit advance."  Minn. Stat. § 47.601 subd. 1(d).  Notably, "consumer short-term lenders" that are subject to regulation include not only those entities that "mak[e]" loans but also those that "*arrang[e]*" loans.  Minn. Stat. § 47.601 subd. 1(e) (emphasis added).

Minnesota caps the interest and other fees that may be lawfully charged on consumer short-term loans.  Minn. Stat. § 47.60 subd. 2.  For short-term loans under $350, the fees and interest limits are significantly capped to flat amounts determined by the amount of the loan.  *Id*.  For loans above $350 and less than $1,000, Minnesota law caps

the annual interest rate at 33%, and caps administrative fees at $25.  Minn. Stat. § 47.601

subd. 2(a)(3)(ii).  Under Minnesota law, a "consumer short-term loan transaction is deemed

to take place in the state of Minnesota if the borrower is a Minnesota resident and the

borrower completes the transaction, either personally or electronically, while physically

located in the state of Minnesota."  Minn. Stat. § 47.601 subd. 5; *see generally Swanson v.*

*Integrity Advance, LLC*, 870 N.W.2d 90, 92 (Minn. 2015) (discussing Minnesota's

regulation of online short-term lending).

Minnesota law also requires consumer short-term lenders to obtain a license from

the Minnesota Department of Commerce and provide certain information to the

Department about their lending to Minnesotans.  Minn. Stat. § 47.601, subd. 2(a)(3)(i).

The Department of Commerce maintains a list of the payday lenders who are licensed to

lend or arrange loans to Minnesotans, which is available on its website.[1]  Minn. Stat. §

47.601 went into effect on August 1, 2009.  *See* 2009 Minn. Session Law S.F. No. 806.[2]

## II.    Defendants Arrange Illegal Loans.

Defendants operate the website www.moneymutual.com ("MoneyMutual

Website").  MoneyMutual, LLC holds the MoneyMutual Website, but otherwise has no

employees.  (Declaration of Tim Madsen ("Madsen Decl.") ¶ 5, ECF No. 29; Declaration

of John G. Albanese ("Albanese Decl."), Ex. 2, Deposition of Glenn McKay ("McKay

Dep.") 26:17-18.)  PartnerWeekly is the managing agent for MoneyMutual, and Selling

---

[1] *See* http://www.commerce.state.mn.us/FSLicensees/sl.html (last visited June 1, 2018).
[2] *See* https://www.revisor.mn.gov/laws/?id=68&year=2009&type=0 (last visited June 1, 2018).

Source is the sole owner of both MoneyMutual and PartnerWeekly.  (Declaration of Glenn McKay ("McKay Decl.") ¶¶ 2-4, ECF No. 28.)  Defendants market the MoneyMutual brand and Website via television and internet advertising, and direct marketing to consumers via email and mail, using celebrity spokesperson Montel Williams.  (Madsen Decl. ¶¶ 5, 6; McKay Dep. 17:19-18:10; 19:16-21:25; 47:14-19; 91:6-92:8; 94:6-95:10.)  The MoneyMutual Website was created in 2009 after an advertising company approached Selling Source to "create a brand and advertise it on TV," and Montel Williams has been the spokesperson for the MoneyMutual brand since its inception.  (Albanese Decl., Ex. 3 at 65:14-66:8; Ex. 4; Ex. 5.)

The MoneyMutual Website has not changed significantly throughout its existence. (*Compare* Albanese Decl. Exs. 6, 7, 8 & 9.)  From at least May 2010 until approximately October 2016, the MoneyMutual Website advertised that consumers could "get up to $1,000 as soon as tomorrow" through a short-term loan.  (*Id*., Exs. 7, 8 (showing that at some point after October 4, 2016, and certainly by October 22, 2016, the amount offered changed to "$2,500").)[3]  The Website has never disclosed that the loans offered by the lenders may be illegal in Minnesota, nor has the Website disclosed that MoneyMutual is not licensed in Minnesota.  (*See, e.g.*, *id*., Exs. 6-9.)

To apply for a loan, a consumer fills out an application on the MoneyMutual Website which includes the consumer's name, social security number, address, bank account information, including account number and routing number, military status,

---

[3] Currently, the Website states that a consumer can "get up to $2,500 as soon as tomorrow." https://moneymutual.com/ (last visited June 1, 2018).

income, employment status, email address, phone number, and the consumer's next payday. (*Id.*, Ex. 10, Deposition of David Maple ("Maple Dep.") 21:2-25:22.) These categories of information have remained substantially the same throughout the life of the MoneyMutual Website. (*Id.*) For a period of time, the consumer could enter the amount of the loan requested, but that feature was removed. (Maple Dep. 50:1-24.)

Consumer information that comes in through the MoneyMutual Website is sold to MoneyMutual's network of lenders via PartnerWeekly's "automated" "ping tree" system for selling lead information. (Madsen Decl. ¶ 8.; McKay Dep. 30:16-31:12.) As for the sale of leads, PartnerWeekly enters into lead purchase agreements with lenders. (Madsen Decl. ¶ 6.) Each lender provides PartnerWeekly with a lead purchase insertion order which sets the parameters for a specific "campaign." (*Id.*; McKay Dep. 33:5-10.) Each lead purchase insertion order specifies the type of consumer sought by the lender and about whom the lender is willing to purchase information. (Madsen Decl. ¶ 6.) One of the parameters that a lender can specify is the loan amount that the consumer is seeking. (*See, e.g.,* Albanese Decl. Ex. 11 (specifying that lender wants consumers seeking between $200 and $1,000).) The lead purchase agreements and lead purchase insertion orders have not changed materially since 2009. (*Id.*, Exs. 12, 13.) ████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████ (McKay Dep. 72:1-74:3; Albanese Decl. Ex. 14.)[4]

If a consumer is matched with a lender, the consumer is redirected automatically to the lender's website and sent an email with the lender's contact information. (Maple Dep. 33:4-8; 34:24-35:13.) According to Defendants' representatives, the "industry range" is that 30%-60% of leads sold result in a consummated loan transaction. (McKay Dep. 124:22-126:14; Albanese Decl. Ex. 15, Deposition of Tim Madsen ("Madsen Dep.") 46:14-47:22.)[5] Defendants' "ping tree" system has operated in "basically" the same fashion since 2009. (McKay Dep. 31:19-32:6.)

Defendants have produced a spreadsheet detailing all of the leads sold by Defendants regarding Minnesota consumers ("Lead Acquisition Spreadsheet"). (Albanese Decl. ¶ 3.) Per the Lead Acquisition Spreadsheet, Defendants sold 41,154 leads regarding Minnesota consumers to their lenders during the period of September 29, 2009 to October 19, 2017. (*Id.*) Based on the number of unique home phone numbers associated with consumers in the Lead Acquisition Spreadsheet, Plaintiffs estimate that these leads correspond to approximately 27,887 Minnesotans. (*Id.*) As an exemplar of lead information included in the Spreadsheet, Plaintiffs have attached the information from the Lead Acquisition Spreadsheet regarding the Named Plaintiffs to the Albanese Declaration.

---

[4] As far as Plaintiffs' counsel can tell, this warranty was removed in 2013. (Albanese Decl. Ex. 13, *compare* DEF006659 *with* DEF006687-88.)

[5] Mr. McKay testified that this "industry range" was based on conversations with other lead generators, while Mr. Madsen testified it was based on discussions with lenders.

(*Id*. Ex. 16.)[6]  By matching up the "campaign" information in the Lead Acquisition Spreadsheet with the corresponding lead purchase insertion order, one can calculate the total amount of revenue that Defendants received from the sale of Minnesota leads.  (*Id*. ¶ 4.)

Defendants have also produced the banking information provided to them by Plaintiffs Rilley, Kunza, and former plaintiffs Linda and Michael Gonzales, including the bank name, account number, and routing number, and Defendants' counsel have indicated that Defendants preserved the same banking information for other putative class members. (*Id*. ¶ 5 & Ex. 16.)

Defendants are not licensed to arrange loans in Minnesota (McKay Decl. ¶ 7; Madsen Decl. ¶ 19), and neither are their lenders.  Per the MoneyMutual Website, the loans offered by Defendants' lenders have annual interest rates with a "typical representative APR range . . . somewhere between 261% and 1304% for a 14-day loan." (Albanese Decl., Ex. 9 at PLF-0001227.)  Of the over 100 entities to which Defendants sold Minnesota leads, Plaintiffs have been able to identify only one lender who was licensed at any time during the class period (Flurish dba Lendup), and only 192 leads were sold to that lender. (Albanese Decl. ¶ 6.)  Defendants also sold a small number of leads to other "lead generators," which then presumably resold the information to another lender.  Based on the information available to them at present, Plaintiffs estimate the number of leads sold to other lead generators to be around 1,211.  (*Id*. ¶ 8.)  Many of the lenders in Defendants'

---

[6] The entire Spreadsheet is available for review should the Court so desire.  It contains the same information for other leads as shown for the Named Plaintiffs in the excerpt.

network have been found to be lending illegally by the Department of Commerce, or have been sued by the Minnesota Attorney General. (*Id.*, Ex. 17; Second Am. Compl. ("SAC") ¶ 28 n.1 & Ex. C, ECF No. 85.) In total, it appears that Defendants sold 39,751 leads to unlicensed lenders during the class period. (Albanese Decl. ¶ 9.)

As described previously in this case (Plfs.' Mem. in Opp. to Mot. to Dismiss, ECF Nos. 101 & 102, at 10-14), Defendants are closely associated with Scott Tucker, a notorious online lender and convicted felon who operated a number of illegal, unlicensed online lenders under a variety of trade names, including Ameriloan, Preferred Cash Loans, United Cash Loans, OneClickCash, 500Fast Cash, Advantage Cash Services, and Star Cash Processing.[7] The Minnesota Department of Commerce has found that most of these entities were lending illegally in Minnesota. (Albanese Decl., Ex. 17.) There is no evidence that any of Tucker's lending entities were licensed in Minnesota during the class period.

The loans from Tucker's entities all had similar terms that violated Minnesota law. As described in the order granting summary judgment to the Federal Trade Commission in its suit against Tucker, the loan terms for Tucker's lending entities were "identical," with principal amounts ranging from $150.00 to $800.00. A borrower was required to pay the full amount, plus a finance charge, before the borrower's next payday or the loan would roll over with a new finance charge. *F.T.C. v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338,

---

[7] Dep't of Justice, Scott Tucker Sentenced to More than 16 Years in Prison for Running $3.5 Billion Unlawful Internet Payday Lending Enterprise (Jan. 5, 2018), available at https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday (last visited June 1, 2018).

1342-46 (D. Nev. 2014).  The Tucker loans qualify as consumer short-term loans as defined in Minn. Stat. § 47.601 subd. 1(d).  Defendants sold the Tucker lenders a total of 16,390 Minnesota leads, including the sale of Plaintiff Buettner's information to United Cash Loans.  (Albanese Decl. ¶ 9.)

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

(Albanese Decl. Ex. 18.)  Defendants, however, never check the Minnesota Department of Commerce's website or otherwise independently verify that a lender is licensed in Minnesota.  (McKay Dep. 67:6-68:6.)   While the lender onboarding process has "developed over time," Defendants' representative could not point to any "significant" developments.  (*Id.* at 63:20-25.)

The experiences of the Named Plaintiffs are typical of how Defendants' lead generation scheme operated.  All of the Named Plaintiffs visited the MoneyMutual Website from a computer in Minnesota, submitted their Minnesota address and banking information, and were matched with an unlicensed lender that provided a high interest loan with a principal under $1,000.  (Rilley Decl. ¶¶ 7-10; Aldrich Decl. ¶¶ 6-8; Kunza Decl. ¶¶ 8-16; Colquitt-Montgomery Decl. ¶¶ 9-12; Buettner Decl. ¶¶ 6-9; SAC ¶¶ 67-125.) Plaintiffs Aldrich and Kunza have loan documents showing the illegal terms of their loans. (Kunza Decl. Exs. A & B, Aldrich Decl. Ex. A.)  While Plaintiffs Colquitt-Montgomery, Rilley, and Buettner are not in possession of their loan documents, the amounts of the loans and related debits and credits are easily confirmed by their bank records, or emails from

the lenders. (Albanese Decl. Exs. 19-22.) There was nothing "unusual" about any of the interactions that Plaintiffs had with the MoneyMutual Website or Defendants. (McKay Dep. 90:12-91:5.)

Minnesota has warned Defendants that their lead generation scheme violated Minnesota law. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

(Albanese Decl. Ex. 23.) ████████████████████████████

████████████████████████████████████. (Albanese Decl., Ex. 24.) Defendants' designated witness was unprepared to discuss Defendants' response ████████████████ at his deposition. (McKay Dep. 102:19-108:23.) Defendants' counsel has since indicated that Defendants did not respond to the ████████████ ████████████ (Albanese Decl. ¶ 11.)

## III.   Procedural History.

Plaintiffs Rilley and Kunza, along with former plaintiffs Michael and Linda Gonzales, initially filed a complaint against Defendant MoneyMutual, LLC in Dakota County District Court in March 2014. MoneyMutual moved to dismiss, arguing that personal jurisdiction was lacking in Minnesota. The district court denied the motion, and the denial was unanimously affirmed by the Minnesota Court of Appeals and the Minnesota Supreme Court. *Rilley v. MoneyMutual, LLC*, 884 N.W.2d 321 (Minn. 2016). When the case was returned to the Dakota County District Court, Plaintiffs filed a First Amended

Complaint that added Defendants Selling Source and PartnerWeekly.  (ECF No. 1-1.)  The case was removed to federal court, and Defendants filed a motion to dismiss, which this Court granted in part and denied in part.  (Aug. 30, 2017 Order, ECF No. 62.)

On March 20, 2018, Plaintiffs filed the SAC that asserted the same claims as the First Amended Complaint but omitted the claims that the Court had dismissed in its prior order.  (ECF No. 85.)  The SAC also added Plaintiffs Aldrich, Buettner, and Colquitt-Montgomery, and removed the Gonzaleses.  The SAC brings the following claims against Defendants: (1) Minn. Stat. § 47.601; (2) Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. § 325F.69; (3) Minnesota Uniform Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44; (4) False Statement in Advertising Act, Minn. Stat. § 325F.67; (5) Unjust Enrichment; (6) Civil Conspiracy; (7) Aiding and Abetting; and (8) Alter Ego/Piercing the Corporate Veil.  For the claims under the MCFA and MDTPA, Plaintiffs allege that the violations of Minn. Stat. § 47.601 suffice to violate the MCFA and MDTPA. (SAC ¶¶ 141(c), 144(c).)

Discovery in this case is ongoing.  The parties have exchanged written and documentary discovery and Plaintiffs have deposed three of Defendants' witnesses. (Albanese Decl. ¶ 11.)  Plaintiffs have also issued close to 100 subpoenas to the lenders who purchased Minnesota lead information from Defendants.  (*Id.* ¶ 7.)  As one might expect, obtaining records from these illegal lenders has been difficult.  Many of the lenders are either defunct, purportedly located offshore, or claim to be "an arm" of a Native American tribe, making them immune to having to respond to a subpoena.  *See Alltel*

*Communications, LLC v. DeJordy*, 675 F.3d 1100, 1106-07 (8th Cir. 2012) (holding that a third-party subpoena is a "suit" implicating sovereign immunity).[8]

## IV. Plaintiffs' Motion For Class Certification.

Plaintiffs seek to certify the following Class:

> All individuals residing in Minnesota who (1) received a loan from a lender of $1,000 or less, (2) that required a minimum payment within 60 days of loan origination of more than 25 percent of the principal balance, (3) by using moneymutual.com or any MoneyMutual-branded website, (4) from August 1, 2009 through the date the Court certifies the Class.

Plaintiffs seek to certify the Class for the following claims:  Minn. Stat. 47.601 (Count I); MCFA for violating Minn. Stat. § 47.601 (Count II); MDPTA for violating Minn. Stat. § 47.601 (Count III); Unjust Enrichment (Count V); Civil Conspiracy (Count VI); Aiding and Abetting (Count VII); and Alter Ego/Piercing the Corporate Veil (Count VIII).

As set forth below, Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3).  In the event that the Court finds certification under Rule 23(b)(3) to be inappropriate, Plaintiffs alternatively request that their claims for injunctive and declaratory relief be certified under Fed. R. Civ. P. 23(b)(2).

---

[8] The usurious loans made by tribal lenders to Minnesotans are still illegal even if the tribal lender cannot be sued in federal court.  *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 755 (1998) (noting that "[w]e have recognized that a State may have authority to . . . regulate tribal activities occurring within the State but outside Indian country" and that "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them"); *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 113 (2d Cir. 2014) ("Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] ... otherwise applicable to all citizens of [that] State.'") (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148-49 (1973)).

# ARGUMENT

## I.    Class Certification Standard of Review.

"To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005).   The requirements of Rule 23(a) are: "(1) the putative class is so numerous that it makes joinder of all members impracticable; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).   Further, a class "must be adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016).

To certify a class under Rule 23(b)(3), it is required that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

To certify a class under Rule 23(b)(2), the court must find "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 26(b)(2).

"[C]lass action certifications to encourage compliance with consumer protection laws are desirable and should be encouraged." *Khoday v. Symantec Corp.*, No. 11-cv-180 JRT/TNL, 2014 WL 1281600, at *14 (D. Minn. Mar. 13, 2014).   "The district court is

accorded broad discretion to decide whether certification is appropriate . . . ." *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012). "This discretion extends to defining the scope of the class." *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir. 1980). While the "court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (internal quotation and citation omitted). "Plaintiffs bear the burden of showing that a class action is appropriate, and that the requirements of Rule 23 are met." *Khoday*, 2014 WL 1281600, at *13.

Here, class certification is appropriate under Rule 23(b)(3). Defendants' lead generation scheme affected thousands of Minnesotans, and there are a number of common questions of fact and law that predominate over individual questions. Moreover, while there might be some individualized damage issues, damages are formulaic, meaning the same method will be used to determine each class member's damages. Individual damages can largely be determined by bank records and other reliable documentary evidence. A similar class of California consumers was recently certified against the same Defendants. *Gilbert*, 318 F.R.D. 614 (certifying class of California consumers alleging that Defendants assisted unlicensed lenders in making usurious loans). The result should be the same here.

In the alternative, should this Court decline to certify a class under Rule 23(b)(3), Plaintiffs request that the Court certify their claims for injunctive and declaratory relief under Rule 23(b)(2). Defendants have arranged and continue to arrange loans with

unlicensed lenders for all class members and, at a minimum, should be enjoined from continuing to prey on Minnesota consumers.

## II. The Proposed Class Meets the Fed. Riv. P. 23(a) Requirements.

### A. The Class is Sufficiently Numerous.

In the Eighth Circuit, "[n]o arbitrary rules regarding the necessary size of classes have been established." *Paxton v. Union Nat. Bank*, 688 F.2d 552, 559 (8th Cir. 1982). "In general, however, a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *Murphy v. Piper*, No. 16-cv-2623 (DWF/BRT), 2017 WL 4355970, at *3 (D. Minn. Sept. 29, 2017) (internal quotations omitted). "[I]t is not necessary for the class representatives to either identify each particular member of the class or the exact number of class members; instead the trial court may reasonably infer that numerosity is satisfied from the facts of the case." *Sondel v. Nw. Airlines, Inc.*, No. 92-cv-381, 1993 WL 559031, at *6 (D. Minn. Sept. 30, 1993); *see also Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014) ("[A] class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit.").

Here, the Class is sufficiently numerous. From September 29, 2009 to October 19, 2017, Defendants sold 41,154 leads on approximately 27,887 Minnesotans. (Albanese Decl. ¶ 3.) Over 99% of the leads that were sold to lenders not licensed in Minnesota. (*Id.* ¶ 9.) The Tucker lenders, which all provided loans that meet the class definition, were sold a total of 16,390 Minnesota leads. (*Id.* ¶ 10.) Given Defendants' estimate that 30%-60%

16

leads sold result in a loan transaction, and that Defendants sold leads about 27,887 Minnesotans, there are likely somewhere between 8,366 to 16,732 class members and certainly more than 40. Numerosity is satisfied.

> B.    There Are Common Questions of Law and Fact.

Rule 23(a)(2) requires that "there are questions of law and fact common to the class." To establish commonality, there must be a "common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "For purposes of the commonality requirement, the relevant inquiry is not whether those common issues predominate, but only whether there is at least a single common contention that satisfies the above criteria." *Khoday*, 2014 WL 1281600, at *15; *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016) (noting that "a single common question 'will do' for purposes of Rule 23(a)(2)") (quoting *Dukes*, 564 U.S. at 359).

Here for each of the claims, there are common questions that can be answered with common evidence and that do not require examination of the individualized circumstances of each class member. Accordingly, commonality is met for all of the claims sought to be certified.

> i.  *There Are Common Questions for the Class Claim under Minn. Stat. §*
> *47.601.*

To succeed on Plaintiffs' claim for violation of Minn. Stat. § 47.601, Plaintiffs will need to show that Defendants arranged consumer short-term loans with lenders or failed to make the disclosures required by Minn. Stat. § 47.601 subd. 2(c).

The question of whether Defendants are a "consumer short-term lender" "engaged in the business of making or arranging" loans within the meaning of Minn. Stat. § 47.601 subd. 1(e) is a common question that can be proven with common evidence.  Defendants' lead generation scheme, how it was marketed, and Defendants' processes for matching consumers with lenders, is all automated with Defendants' "ping tree," operating in substantially the same fashion throughout the entire class period.  (McKay Dep. 31:19-32:6.)  Defendants' interactions did not vary meaningfully from consumer to consumer. There are no individualized circumstances that would bear on whether Defendants' lead generation business constituted "arranging" loans.  The question of whether Defendants' conduct was sufficient to constitute "arranging" loans, thus requiring Defendants to be licensed, is therefore common to all class members, because Defendants' conduct was the same as to all.

Whether Defendants provided the disclosures required by Minn. Stat. § 47.601 subd. 2(c) is also a common question that can be determined with common evidence.  Defendants have stated that they do not know the terms of any particular loan that they arranged (Madsen Decl. ¶ 10.)  Therefore, they could not, and did not, provide the required disclosures.

Lastly, Minn. Stat. § 47.601 subd. 6(3) provides for "statutory damages of up to $1,000 per violation." The amount of statutory damages due to class members for violations of the statute is a common question that can be resolved with common proof. *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952-53 (7th Cir. 2006). Accordingly, there are a number of common questions for Plaintiffs' claim under Minn. Stat. § 47.601.

> ### ii. There Are Common Questions for the Class Claim under the MCFA and MDTPA.

The MCFA prohibits the "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled." Minn. Stat. § 325F.69 subd. 1. To recover damages under the MCFA, a consumer needs to show a "causal nexus" between the defendant's conduct and the consumer's damages, but "[t]his causal nexus, however, 'need not include direct evidence of reliance by individual consumers.'" *City of Farmington Hills Employees Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 356 (D. Minn. 2012) (quoting *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 14 (Minn. 2001)). "Rather, the causal nexus and its reliance component may be established by other direct or circumstantial evidence that the district court determines is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct." *Grp. Health*, 621 N.W.2d at 14.

Plaintiffs also allege that Defendants' arranging of loans with unlicensed lenders constitutes a violation of the MDTPA under various sections of the statute, including Minn.

Stat. § 325D.44 subd. 1(13), which prohibits "engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." (SAC ¶¶ 145-6.) "A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits, or intent to deceive is not required." Minn. Stat. § 325D.45.

In its order on Defendants' motion to dismiss the First Amended Complaint, this Court noted that it would not have dismissed Plaintiffs' MCFA and MDTPA claims based on the predicate violation of Minn. Stat. § 47.601. (Aug. 30, 2017 Order at 19 n.8 & 22. n.9.)

Here, there are common questions for the MCFA and MDTPA claims. First, the question of whether Defendants' business of arranging of loans with unlicensed lenders was a "deceptive practice" within the meaning of the MCFA is a common question that can be resolved in a single stroke. Similarly, the Court can resolve whether Defendants' violation of Minn. Stat. § 47.601 was a practice that "creates a likelihood of confusion or of misunderstanding" under the MDTPA. Given the uniformity and consistency of Defendants' conduct in arranging loans and other practices, including the marketing and the content of the MoneyMutual Website, and the ubiquitous presence of Montel Williams to give Defendants' lenders and loans the facade of legitimacy and legality, the question of whether there is a causal nexus under the MCFA between class members' damages and Defendants' unlawful conduct is a common question. Notably, all of the Named Plaintiffs thought that Defendants were operating a legitimate, legal business. (*See* Aldrich Decl. ¶¶

20

9-10; Montgomery Decl. ¶¶ 7-9, 13; Buettner Decl. ¶¶ 10-11; Kunza Decl. ¶¶ 17-18; Rilley Decl. ¶ 12); *City of Farmington Hills*, 281 F.R.D. at 356 (certifying MCFA class claim where misrepresentation was common to all class members and was designed "to instill a belief about the nature of the risk of the investment"); *Khoday*, 2014 WL 1281600, at *31 (certifying MCFA claim because defendant "ha[d] not refuted the common sense inference that its representations may have successfully persuaded class members" to purchase a product that class members did not need).

Commonality is therefore met for the claims under the MCFA and MDTPA.

### iii. There are Common Questions for the Class Claims for Aiding & Abetting and Civil Conspiracy.

The claims for Aiding and Abetting and Civil Conspiracy present common questions that can be resolved with common proof. Aiding and abetting requires that "(1) a primary actor committed a tort that caused injury to the plaintiff, (2) the aider and abettor knew that the primary actor's conduct constituted a tort, and (3) the aider and abettor substantially assisted or encouraged the primary actor in committing the tort." *ECTG Ltd., Trustwater, Ltd. v. O'Shaughnessy*, No. 14-cv-960-DSD/JJK, 2014 WL 6684982, at *4 (D. Minn. Nov. 25, 2014). Thus, whether (1) the unlicensed lenders committed a tortious act against class members, (2) whether Defendants knew that the lenders were committing a tortious act, and (3) whether Defendants substantially assisted or encouraged the unlicensed lenders, are all common questions where proof is not individualized to any particular class member.

Similarly, proving a civil conspiracy requires "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy." *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1498 (8th Cir. 1997). Here, whether Defendants and the lenders conspired to make illegal loans is common to all class members and does not depend on individualized considerations. As shown by the general uniformity of the lead purchase agreements, lead purchase insertion orders, and lender onboarding process, Defendants' interactions with the lenders did not differ significantly from lender to lender. Commonality is thus satisfied for these claims.

> ### iv. *There are Common Questions for the Class Claim for Alter Ego/Veil Piercing.*

Plaintiffs' alter ego/veil piercing claim depends entirely on evidence common to all class members because the claim involves Defendants' interactions with each other and does not depend in any way on Defendants' interactions with any particular class member. MoneyMutual and PartnerWeekly are Nevada LLCs, and Selling Source is a Delaware LLC, and all three entities are headquartered in Nevada. (McKay Decl. ¶ 2.) Which state's law to apply to the alter ego determination presents a choice of law question that this Court need not decide at this point. *Tang v. Northpole Ltd.*, 314 F.R.D. 612, 618 (W.D. Ark. 2016) (describing choice-of-law inquiry). Whether Nevada, Delaware, or Minnesota law applies is not relevant to the class certification analysis because whatever law applies will apply to the claims of all class members and, in any event, the laws of all three states focus

solely on Defendants' structure and conduct.  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) ("To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present.") (internal quotations and modifications omitted); *In re Giampietro*, 317 B.R. 841, 848 (Bankr. D. Nev. 2004) (stating similar requirements under Nevada law); *Minnesota Power v. Armco, Inc.*, 937 F.2d 1363, 1367 (8th Cir. 1991) (stating similar requirements under Minnesota law).  The questions of whether (1) MoneyMutual is an alter ego of PartnerWeekly, and (2) MoneyMutual and PartnerWeekly are alter egos of Selling Source, can be decided entirely with common evidence that does not differ among class members.

    *v.  There are Common Questions for the Class Claim of Unjust Enrichment.*

   As an alternative to their other claims, Plaintiffs have also brought a claim for Unjust Enrichment.  "In order to establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001).  Whether Defendants were unjustly enriched by profiting off of the sale of class members' information to lenders is a common question suitable for class treatment.  Where an unjust enrichment claim is premised off of the same legal theory and facts as claims under consumer protection statutes, commonality is met, and certification of an unjust enrichment claim is proper.  *Khoday*, 2014 WL 1281600, at *31 (certifying unjust enrichment class

when claims were "based on the same claims that were certified under consumer protection statutes" and concluding that "[b]ecause Plaintiffs' unjust enrichment claims arise out of the same conduct as the statutory claims, the Court concludes that class issues will also predominate regarding whether Defendants were unjustly enriched at class members' expense").

C.      Plaintiffs are Typical of Class Members.

Typicality "is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." *Paxton*, 688 F.2d at 561-62. "Factual variations will not necessarily preclude certification if 'the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory.'" *City of Farmington Hills*, 281 F.R.D. at 352 (quoting *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996)).

Here, Plaintiffs' claims are typical of the class members' claims and are based upon the same legal theories and course of conduct.  The operation of Defendants' "ping tree" for selling lead information to lenders, and the content and operation of the MoneyMutual Website, have not changed in any significant fashion throughout the class period.  There was nothing unusual or atypical about Plaintiffs' interactions with the MoneyMutual Website.  (McKay Dep. 90:12-91:5.)  Nor was there anything out-of-the-ordinary with respect to the interactions among Plaintiffs and the lenders.  Typicality is easily satisfied here.

D.      The Proposed Class Representatives and Class Counsel Are Adequate.

"In order to satisfy the adequacy requirement, Plaintiff must show that: (1) the representative and its attorneys are able and willing to prosecute the action competently and vigorously; and (2) the representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *City of Farmington Hills*, 281 F.R.D. at 353. "'Challenges to adequacy are not relevant unless they bear on the existence of conflicts among class members or plaintiffs' ability to vigorously prosecute their case.'" *Khoday*, 2014 WL 1281600, at \*17 (quoting *Johnson v. Harley-Davidson Motor Co. Grp., LLC*, 285 F.R.D. 573, 578 (E.D. Cal. 2012)).

Here, the putative Class Representatives understand their roles as class representatives. (Aldrich Decl. ¶¶ 3-5; Kunza Decl. ¶¶ 3-5; Rilley Decl. ¶¶ 3-5; Buettner Decl. ¶¶ 3-5; Colquitt-Montgomery Decl. ¶¶ 3-5.) All of the Class Representatives are committed to achieving a satisfactory result for the Class and do not have any conflicts with absent class members. (Aldrich Decl. ¶ 5; Kunza Decl. ¶ 5; Rilley Decl. ¶ 5; Buettner Decl. ¶ 5; Colquitt-Montgomery Decl. ¶ 5.) The Class Representatives are able and willing to pursue this action, and in the case of Plaintiffs Rilley and Kunza, they have remained committed to this case for over four years. All of the proposed Class Representatives are adequate.

Further, proposed Class Counsel is qualified to serve. E. Michelle Drake, John Albanese, and Jeff Osterwise from Berger & Montague, P.C. and Mark Heaney from the Heaney Law Firm, LLC are experienced consumer advocates with substantial experience in prosecuting consumer class actions. (Albanese Decl. ¶¶ 12-19 & Ex. 1; Heaney Decl.

¶¶ 3-5.)  Berger & Montague, P.C. was founded in 1970, and has been concentrated on representing plaintiffs in complex class actions ever since.  (Albanese Decl., Ex. 1.)  All three lawyers from Berger & Montague, P.C. have extensive class action experience.  (*Id.*)  Mark Heaney has been an active consumer lawyer for over 12 years, and has been class counsel in multiple consumer class actions.  (Heaney Decl. ¶ 4.)  Attorneys Drake, Albanese, and Heaney have prosecuted this case from its inception, defeated multiple motions to dismiss, won a decision at the Minnesota Supreme Court, and have thus far engaged in robust, ongoing discovery.

## III.   The Requirements of Rule 23(b)(3) Are Satisfied.

### A.   Common Issues Predominate.

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  When considering predominance, the core issue is "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623.  "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."  *Khoday*, 2014 WL 1281600, at *18.

Here, as explained above, liability for each of Plaintiffs' claims can be proven with common evidence.  Liability for the claims sought to be certified depend on Defendants' standardized and automated interactions with consumers and lenders, Defendants' state-

of-mind, and Defendants' interactions with each other.  In particular, whether Defendants "are engaged in the business" of "arranging" loans with lenders is the overriding question in this litigation, one that affects multiple claims, and one that can be answered entirely with common proof.   There are no liability questions that depend on Defendants' individualized interactions with any particular class members.  Because all the questions related to liability can be proven with common evidence, common questions will predominate over any individual issues.

In terms of damages, Plaintiffs are seeking all amounts paid to the lenders, statutory damages as provided by Minn. Stat. § 47.601 subd. 6(3), and disgorgement of all moneys received from Defendants for selling Minnesota leads to lenders.  (SAC ¶¶ 179(g), (h).) The amounts Defendants made from selling Minnesota leads can be calculated on a class basis, as can the amount of statutory damages.  The amount of money paid to the lenders by class members will vary, but as discussed below, can be determined using objective evidence.  Variation in damages, however, is not a meaningful hurdle to class certification in this case.

Even where damages "cannot ultimately be calculated on a classwide basis, class certification is still appropriate if the other certification factors are met and there is no risk that individual damages issues outweigh the classwide issues."  *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 489 (D. Minn. 2015); *Khoday*, 2014 WL 1281600, at *13 ("[T]hat the amount of damage suffered by each class member may be an individual inquiry does not defeat class action treatment.").  "If the issues of liability are genuinely common issues, and the damages of individual class members can be readily

determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). "Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits." *Id.* As stated by the Second Circuit:

> There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) (footnote omitted). Discovery in this case is far from complete, and whether any of these "management tools" needs to be employed is a decision that can be made after the close of discovery.

Importantly, this is not a case where the determination of damages awarded will largely depend on individualized testimony, such as in a case where the consumer is seeking emotional distress. Because the loans were credited and debited using the ACH transactions to the consumers' bank accounts, bank records will show the relevant transactions that could be used to calculate damages. Indeed, Plaintiffs have been able to obtain their own relevant bank records via narrowly tailored subpoenas, limited in part by the banking information and other data provided from Defendants in this case, and should

28

the Class be certified, similar subpoenas could be used to obtain class members' records, if the consumers themselves do not already have them.  Moreover, some consumers may still have online access to their payment history with the lenders.  Thus, in no instance can individualized damages issues be said to overwhelm common liability issues.  *See Gilbert*, 318 F.R.D. at 625 n.7 (rejecting contention "that individual issues relating to damages would predominate") (citing *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 513 (9th Cir. 2013)).

B.      A Class Action is the Superior Method for Adjudicating This Case.

In considering superiority, "courts generally look to the following non-exhaustive list of relevant factors: (1) the interest of class members in individually controlling the prosecution of their claims; (2) the extent and nature of any litigation that has already begun; (3) the desirability of concentrating the litigation in a particular forum; and (4) the likely difficulties of managing a class action."  *Khoday*, 2014 WL 1281600, at *35.  "Class actions are also superior if the alleged damages are small, and absent a class action most plaintiffs would not realistically enjoy a day in court."  *Id.* at *35.

Proposed Class Counsel is unaware of any suits brought on an individual basis against Defendants, and thus it is doubtful that individual class members would prefer to control separate actions.  (Albanese Decl. ¶ 21.)  Further, given the alleged damages are small on an individual basis, individual suits are largely impracticable even if the consumer is aware that he or she has a claim.  *See Hartley v. Suburban Radiologic Consultants, Ltd.*, 295 F.R.D. 357, 379 (D. Minn. 2013) (finding consumer class action superior because it was "unlikely" that "all class plaintiffs" would bring their own claims); *City of Farmington*

*Hills*, 281 F.R.D. at 357 ("[C]lass members who may not otherwise have the means to litigate their claims will likely benefit greatly from a class action, and a class action will ensure that class members who are otherwise unaware that they possess a claim will have their rights represented."). Class litigation is thus not only the most efficient means of adjudicating these disputes; it is the only means. Lastly, given the amount of common proof and evidence, and that all of the claims stem from the same generalized proof, there are no foreseeable management issues that should preclude class certification. *City of Farmington Hills*, 281 F.R.D. at 357 ("Finally, the Court foresees little difficulty in managing a class action based on the similarity of the contracts and the likely ability of the class members to prove their claims with generalized evidence.").

## IV.   The Class is Objectively Defined and It Is Administratively Feasible to Identify Class Members.

In addition to analyzing the criteria explicitly set forth in Rule 23, courts also examine the class definition to ensure that class members can be reasonably identified, or "ascertained." "The Eighth Circuit does not impose a separate ascertainability requirement for class certification but 'adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class must be adequately defined and clearly ascertainable.'" *Murphy*, 2017 WL 4355970, at \*3 (quoting *Sandusky Wellness Ctr., LLC*, 821 F.3d at 996). "A class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). Ascertainability is satisfied even if individual review of class members' files would be required to determine class

membership.  *Id.* (upholding class certification where court ordered an "intensive file-by-file review process" for determining class membership).

Here, the proposed Class is objectively defined.   Whether a given individual received a loan that satisfies the class definition is an unambiguous matter of fact.   This objectivity differentiates this case from cases where courts have found that class membership was not capable of objective determination.  *See, e.g., DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (rejecting class definition that included people who were "active in the peace movement" as insufficiently objective).   Instead, this case is much more like a securities case, the traditional staple of the federal class action.   In those cases, courts routinely certify classes and allow a variety of supporting documents to be used to identify class members, such as account statements, registration documents, or broker-dealer statements:

> The standard for ascertainability is not demanding. It is designed only to prevent the certification of a class whose membership is truly indeterminable. This standard in mind, Plaintiffs have proposed ascertainable subclasses. Given that the subclasses may be ascertained with reference to investor records, it is administratively feasible to determine whether an investor is a member of the institutional investor subclass, the retail investor subclass, or no subclass at all. Though documentation may be required, mini-hearings on the merits of each investor's inclusion in the subclasses will not be.

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (internal citations and quotations omitted); *see also Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-786-ADM/TNL, 2016 WL 4098741, at *13 (D. Minn. July 28, 2016).

Here, as in other cases involving financial instruments, identifying class members is administratively feasible.   Defendants have already identified a limited universe of potential class members, namely those individuals who are included on the Lead Acquisition Spreadsheet.   Whether a lead resulted in a loan that qualifies for class membership is easily determined through objective and verifiable evidence.   Documentary evidence demonstrating class membership includes class members' loan agreements (Kunza Decl. Ex. A & B; Aldrich Decl. Ex. A), emails stating the loan amount and terms (Albanese Decl. Ex. 25), bank records which show the credits and debits from the lenders to the consumer's account (*id.*, Exs. 19-22), and/or payment records from the lenders (*id.*, Ex. 26).   Affidavits or statements from class members may also suffice.   Alba Conte & Herbert B. Newberg, *3 Newberg on Class Actions*, § 10:12 (4th ed. 2002) ("Methods of claim verification may also vary with the ease of documenting claims by individual members, and also the size of the claim involved. A simple statement or affidavit may be sufficient where claims are small . . . . "); *Boundas v. Abercrombie & Fitch Stores, Inc.,* 280 F.R.D. 408, 417-18 (N.D. Ill. 2012) ("[A]nybody claiming class membership [who does not have written proof] will be required to submit an appropriate affidavit, which can be evaluated during the claims administration process . . . .").

The fact that class members have not yet been ascertained, or that it may be time consuming to do so is not a bar to certification.   "[C]lass members need not actually be ascertained prior to certification."   *Beaver Cty. Employees' Ret. Fund*, 2016 WL 4098741, at *13 (certifying class of aftermarket purchasers because whether someone is an aftermarket purchaser is "objective; it either was or was not.").   "[A] class is not rendered

unascertainable merely because an analysis of data is necessary to determine class membership…The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012) (internal quotations and citations omitted).   Thus, while class membership cannot be determined solely by Defendants' records, the Class can be ascertained using objective criteria, and is therefore certifiable.   This Court should reach the same conclusion the court reached in *Gilbert*, in which it certified a class of California consumers against Defendants:

> Although the loans at issue may have been small, the decision to obtain a payday loan is likely to be memorable and to the extent the Unlicensed Lenders deducted fees from a putative class members' bank account, that fact would be documented in bank records. Further, the record demonstrates that the MoneyMutual Defendants . . . maintain business records that may be used, in conjunction with other records, to identify class members.

*Gilbert*, 318 F.R.D. at 624.   The Class here is sufficiently numerous, objectively defined, and clearly ascertainable, and should be certified.

## V.   In the Alternative, This Court Should Certify Plaintiffs' Claims for Injunctive and Declaratory Relief Under Rule 23(b)(2).

In the alternative, and only if the Court declines to certify a class under Rule 23(b)(3), Plaintiffs move to certify their claims for injunctive and declaratory relief under Rule 23(b)(2).   "The Eighth Circuit has stated that, '[i]f the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2).'"   *Vogt v. State Farm Life Ins. Co.*, No. 16-cv-04170, 2018 WL 1955425, at *7 (W.D. Mo. Apr. 24, 2018) (quoting *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995)).   "Rule 23(b)(2) applies only

when a single injunction or declaratory judgment would provide relief to each member of the class." *Ebert*, 823 F.3d at 480. "Since class members cannot opt out of a (b)(2) class and there is no requirement for the court to provide notice, 'the cohesiveness requirement of Rule 23(b)(2) is more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3).'" *Murphy*, 2017 WL 4355970, at *14 (quoting *Ebert*, 823 F.3d at 480).

Here, Plaintiffs seek injunctive and declaratory relief as specifically provided by Minn. Stat. § 47.601 subd. 6(5), Minn. Stat. 325D.45 subd.1, Minn. Stat. § 8.31 subd. 3(a), and the inherent power of the Court.   Specifically, Plaintiffs seek a declaration that Defendants violated Minnesota law by arranging loans with unlicensed lenders, and an injunction requiring that Defendants obtain the required licenses and cease arranging loans with lenders not licensed by the state of Minnesota.  Defendants' unlawful conduct applies generally to the Class.  Final injunctive relief would be appropriate and respect the Class as a whole because this relief would affect all class members at once.  Since Plaintiffs are requesting that the Rule 23(b)(2) Class be certified in the alternative only, such a certification would not impermissibly infringe on an claim for monetary damages, nor are monetary damages the primary relief sought should the Rule 23(b)(2) Class be certified. Under these circumstances, class certification under Rule 23(b)(2) is proper.  *Bond v. Liberty Ins. Corporation*, No. 15-cv-04236, 2017 WL 1628956, at *16 (W.D. Mo. May 1, 2017) (certifying class under Rule 23(b)(2) for declaratory relief and injunctive relief); *Ebert*, 823 F.3d at 480 (noting that certifying Rule 23(b)(2) class that is "insulat[ed] . . .

from the money-damage portion of the case, is an available approach that is gaining ground in class action suits").

## CONCLUSION

For all of the above reasons, the Court should grant Plaintiffs' motion for class certification.

BERGER & MONTAGUE, P.C.

Date:  June 1, 2018

/s/John G. Albanese
E. Michelle Drake, Bar No. 0387366
John G. Albanese, Bar No. 0395882
BERGER & MONTAGUE, P.C.
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Mark Heaney, Bar No. 0333219
HEANEY LAW FIRM, LLC
13911 Ridgedale Drive, Suite 110
Minnetonka, MN 55305
Tel.: 952.933.9655
Fax: 952.544.1308
mark@heaneylaw.com

Jeffrey Osterwise (*pro hac vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel.: 215.875.3000
Fax: 215.875.4604
josterwise@bm.net

ATTORNEYS FOR PLAINTIFFS

Exhibit D

 **Moss & Barnett**

December 4, 2017

*VIA U.S. MAIL AND EMAIL* jalbanese@bm.net

Mr. John Albanese, Esq.
Berger & Montague, P.C.
45 SE Main Street, Suite 505
Minneapolis, MN 55414

Re:   Subpoena to Lion Loans
      *Scott Rilley, Michelle Kunza, Linda Gonzalez, Michael Gonzales*
      *v.MoneyMutual, LLC, Selling Source, LLC, and PartnerWeekly, LLC*
      Court File No.: 0:16-cv-04001-DWF-LIB
      Subpoena Date:  November 7, 2017
      Subpoena Production Date: December 7, 2017, 12:00 p.m.

Dear Mr. Albanese:

This office represents MoneyLion, Inc. and its affiliated entities (collectively, "MoneyLion"), which received via US mail a Production Subpoena dated November 7, 2017 ("Subpoena"), directed to "Lion Loans" in the above-referenced matter ("Action"). In accordance with Rule 45(d)(2)(B) of the Federal Rules of Civil Procedure ("FRCP"), and presuming the Subpoena was intended to be directed to it, please be advised that MoneyLion asserts the following objections to the Subpoena:

**General Objections:**

1.  The Subpoena names and is directed to "Lion Loans". Although MoneyLion uses "Lion Loans" as a product name, to the knowledge of MoneyLion, there is no legal entity by that name. Accordingly, the Subpoena is not directed to a proper entity.

2.  The Subpoena was mailed to a post office box in Sandy, Utah. That does not conform to the requirements for service of a subpoena under Rule 45, FRCP.

3.  The Subpoena requires production of requested documents at your office in Minneapolis. That is not in conformance with Rule 45(c)(2)(A), FRCP, which requires "production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person."

4.  Even if the Subpoena had been properly served and directed to a legal entity, MoneyLion received the Subpoena on or about November 14, 2017; the Subpoena requires responses on or before December 7, 2017. Given the expansive nature of the items requested and the work required to identify and produce responsive documents, if any, the Subpoena fails to allow a reasonable time for compliance.



5.  The Subpoena seeks information or documents that are overly broad, unduly burdensome, and not relevant in light of the District Court's August 30, 2017 order dismissing or partially-dismissing of many of the claims asserted in their First Amended Complaint, and are therefore beyond the scope of the Action and not reasonably calculated to lead to the discovery of admissible evidence. MoneyLion objects to each request, to the extent that responding to such a request as written would be oppressive, unduly burdensome, excessively time consuming, or unnecessarily expensive.

6.  To the extent that the requests in the Subpoena purport to require information not related to the issues pending in the Action or are not reasonably calculated to lead to the discovery of admissible evidence in that Action, *MoneyLion* objects on the grounds that compliance would impose an undue burden or unnecessary expense

7.  Many of the requested documents should be available to Plaintiff via the named parties to the litigation, which further demonstrates the undue burden of the requests in the Subpoena. Likewise, the Subpoena is objectionable to the extent that it seeks information or documents possessed by persons other than *MoneyLion or its personnel.*

8.  The Subpoena seeks personal and private information related to the financial documents of non-parties to the Subpoena, thus possibly resulting in an impermissible third party disclosure.

9.  The Subpoena seeks information or documents that may be protected by or subject to federal or state privacy laws, including, but not limited to, the federal Fair Debt Collection Practices Act.

10. The Subpoena as it calls for the production of nonpublic personal information ("NPI") and that such NPI may not be disclosed absent a court order, or other judicial process, as per the Graham Leach Bliley Act.

11. The Subpoena seeks information or documents that are private, proprietary, trade secret or otherwise confidential. Responses related to such information will not be given unless deemed confidential pursuant to any protective order entered by the Court.

## OBJECTIONS TO SPECIFIC REQUESTS:

**Request No. 1:** This request essentially requires the non-party witness to first review all *"loan agreements with Minnesota residents"* that may have been consummated over an 8 year period commencing August 1, 2009, and then to further break those down to identify any *"initiated through or facilitated by a lead purchased"* from one of the defendants. It imposes a substantial burden on the responding non-party to review tens of thousands of documents in the first instance to verify those applying to Minnesota residents, only to then make a separate determination as to how they may have been *"initiated or facilitated"*, let alone if by the named defendants. That search would literally require scores of person-hours to conduct. It is not clear how this request is even reasonably calculated to lead to the discovery of admissible evidence in the Action. However, it is quite clear that the request imposes an enormous burden and expense on the non-party to whom the Subpoena is directed.

**Moss & Barnett**

**Request No. 2:** This request builds off the laborious identification process in Request No. 1, and requires the non-party to then research and produce "*the payment history for every [such] loan transaction*" during the same 8-year period, as well as the "*consumer's bank and bank account number.*" The time required to review records and identify – let alone segregate, summarize and produce all requested payment history and account records -- could easily equal the time necessary to respond to Request No. 1. Moreover, how is the payment history and account information for a non-party's loan transactions reasonably calculated to lead to the discovery of admissible evidence in the Action or otherwise proportionate to the needs of the case?

**Request No. 3:** This request seeks "*agreements or contracts with companies to which you furnish information regarding loans for the purposes of credit reporting or collection,*" again over the same 8-year period. Any contracts or agreements that the non-party has with any credit reporting and collection entities have utterly no relevance to the remaining claims of the plaintiffs' in this Action. Accordingly, this request is oppressive and unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence in the Action, nor proportionate to the needs to the case.

**Request No. 4:** This request seeks any contracts that may exist between any of the three defendants and the subpoenaed party. Such contracts, to the extent they may exist, are available from the three defendants. Accordingly, to request such contracts from a non-party is unreasonable, and imposes an unnecessary burden to identify and produce any such contracts.

**Request No. 5:** Request 5, which seeks any "communications" that the subpoenaed non-party may have had with any of the defendants over an eight-year period concerning a broad range of topics, is patently overbroad and imposes an undue burden on the subpoenaed non-party. The range of topics covered in such communications as set out in this request is numerous, vague and ill-defined. It would require hundreds of person-hours to review written correspondence, emails, phone logs and other documents or records constituting a "communication" over this eight-year period just to identify if it involved any of the defendants let alone whether it was responsive to the broad scope of the request. Furthermore, the six categories of topics of communication have no discernible relevance to the claims asserted by plaintiffs in the Action and, thus, this request is not reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 6:** This request is burdensome inasmuch as records of any "*lending licenses*" issued by the state of Minnesota are available to Plaintiff on-line or through the state.

**Request No. 7:** This request, for "*agreements with any payment processors or banks used that you have used to initiate ACH transactions* on your behalf Minnesota borrowers" over the same eight-year period, has no discernible application to the claims of Plaintiffs in the Action and is, therefore, not reasonably calculated to lead to the discovery of admissible evidence in the Action, nor is it proportionate to the needs of the case. It is thus unduly burdensome on the non-party. Moreover, this request improperly seeks proprietary and confidential information relating to a non-party's financial and banking relationships.



By making the above general and specific objections, MoneyLion is not suggesting or implying in any way that it has information or documents responsive to the Subpoena. Nor is it implying that the Subpoena is valid or enforceable. MoneyLion expressly reserves the right to assert additional general and specific objections to the Subpoena, as appropriate, and to amend or supplement these objections or its response.

Finally, as I am sure you are aware, your office bears responsibility for properly issuing and serving any Subpoena on a non-party. The fact that the Subpoena was mailed to a PO Box and issued in the name of a non-existing entity cuts against the requirement to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena", per Rule 45(d)(1), FRCP. Accordingly, unless the Subpoena is withdrawn or in the event that your office seeks to enforce this Subpoena, MoneyLion reserves its right to seek its reasonable attorney's fees and costs, on the grounds that the Subpoena was issued in violation of the requirements of Rule 45, FRCP, and that it is both without merit, unduly burdensome, and vexatious.

Please direct all future communications regarding the Subpoena to my attention.

Very Truly Yours,

Moss & Barnett

Michael S. Poncin
150 South Fifth Street
Suite 1200
Minneapolis, MN 55402
612-877-5290
Mike.poncin@lawmoss.com

# Exhibit E



| | John G. Albanese |
|---|---|
| **WRITER'S DIRECT DIAL** | 612-594-5997 |
| **WRITER'S DIRECT FAX** | 612-584-4470 |
| **WRITER'S DIRECT E-MAIL** | jalbanese@bm.net |

November 7, 2017

**VIA CERTIFIED MAIL**
Lion Loans
PO Box 1547
Sandy, UT 84091-1547

> **RE:    Production Subpoena,** *Rilley v. MoneyMutual, LLC*, **Case No. 16-cv-04001-DWF/LIB (D. Minn.)**

To Lion Loans:

Enclosed and served upon you is a Subpoena for Production of Documents, with Exhibit A. A copy of the operative complaint, and Protective Order in the above-referenced action are enclosed as well.

You previously received a copy of this Subpoena that put you on notice that certain documents (those described in Exhibit A) may be required to be produced in this litigation. We are now requiring such production.

In lieu of making the production at the address noted on the face of the Subpoena, or if you have written objections to production, you may mail such documents to 43 SE Main Street, Suite 505, Attn: John Albanese, Minneapolis, MN 55414, or email them to jalbanese@bm.net. If you do intend to make the production at the address noted on the Subpoena, please contact my paralegal at jhibray@bm.net or 612-594-5995 to confirm.

Please include with your production an affidavit certifying that the documents produced are business records kept in the course of regularly conducted activity (FRE 803(6), 902(11)).

If you have any questions or concerns, please do not hesitate to contact me at 612-594-5997.

Sincerely,

John Albanese

Encl.

# UNITED STATES DISTRICT COURT

for the

### District of Minnesota

| | |
|---|---|
| Scott Rilley, Michelle Kunza, Linda Gonzales, Michael Gonzales, | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No.0:16-cv-04001-DWF-LIB |
| MoneyMutual, LLC, Selling Source, LLC, and PartnerWeekly, LLC | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:               Lion Loans, PO Box 1547, Sandy, UT 84091-1547

_____

*(Name of person to whom this subpoena is directed)*

   [X] *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

        See Exhibit A.

| Place: Tempest Reporting, 175 S Main St, Suite 710, Salt Lake City, UT 84111 | Date and Time: December 7, 2017, 12:00 P.M. local time |
|---|---|

    [ ] *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

      The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      11/7/2017

        *CLERK OF COURT*

                                   OR

_____        _____
     *Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Plaintiffs
, who issues or requests this subpoena, are: John G. Albanese, Berger & Montague, P.C., 43 SE Main Street, Suite 505, Minneapolis, MN 55414; 612-594-5997; jalbanese@bm.net.

Civil Action No. 0:16-cv-04001-DWF-LIB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                              *Server's signature*

                                   _____
                                              *Printed name and title*

                                   _____
                                              *Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

    **(i)** is a party or a party's officer; or

    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;

    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

    **(iv)** subjects a person to undue burden.

  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

    **(i)** expressly make the claim; and

    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Exhibit A

<u>Instructions</u>

1.      In lieu of producing the documents at the address listed on the subpoena, you may mail the production to Berger & Montague, P.C., Attn: John Albanese, 43 SE Main Street, Suite 505, Minneapolis, MN, 55414, or email it to jalbanese.bm.net.

2.      Please include with your production an affidavit certifying that the documents produced are business records kept in the course of regularly conducted activity (FRE 803(6), 902(11)).

<u>Documents Requested</u>

1.      Copies of your loan agreements with Minnesota residents consummated at any time since August 1, 2009 where your contact with the Minnesota resident was initiated through or facilitated by a lead purchased from MoneyMutual, LLC, PartnerWeekly, LLC, or Selling Source, LLC.

2.      Documents evidencing the payment history for every loan transaction that you have consummated with Minnesota consumers since August 1, 2009 where your contact with the Minnesota consumer was initiated through or facilitated by a lead purchased from MoneyMutual, LLC, PartnerWeekly, LLC, Selling Source, LLC.  These documents should include sufficient information to identify the consumer's bank and bank account number involved in the loan transaction.

3.      Any agreements or contracts that have been in effect since August 1, 2009 with companies to which you furnish information regarding loans for the purposes of credit reporting or collection, including, but not limited to, DataX, FactorTrust, Microbilt, Clarity Services, and CoreLogic Teletrack.

4.	Your contracts with MoneyMutual, LLC, PartnerWeekly, LLC, or Selling Source, LLC that have been in effect since August 1, 2009.

5.	Communications with MoneyMutual, LLC, PartnerWeekly, LLC, or Selling Source, LLC since August 1, 2009 relating to this lawsuit, the legality of your loans, your legal status as a lender, any registrations or certifications held by you, any code of conduct applied by MoneyMutual or its affiliates to you, complaints regarding loans, any contracts or agreements between you and MoneyMutual, LLC, PartnerWeekly, LLC, or Selling Source, LLC, or any other lawsuits involving lending.

6.	Any lending licenses that you have obtained from the state of Minnesota since August 1, 2009.

7.	Agreements with any payment processors or banks that you have used to initiate ACH transactions on your behalf with Minnesota borrowers since August 1, 2009.

**DECLARATION OF SERVICE**
***Rilley v. MoneyMutual, LLC, et al.***
**No. 16-cv-04001 (D. Minn.)**

Jean Hibray of the City of Minneapolis, County of Hennepin, in the State of Minnesota, states that on November 7, 2017, she caused to be served the following document(s):

> *Plaintiffs' Subpoena for Production of Documents, with Exhibit A*

by mailing a copy of the same, with cover letter and enclosures, via Certified U.S. Mail, return receipt requested, properly addressed to:

> *See attached service list.*

Further, the following entities were served, c/o Spencer Fane, with the same via electronic mail on November 7, 2017:

SendLoan.com
Ripple Cash
Radiant Credit
Evergreen Services
c/o Douglas Weems, Spencer Fane - dweems@spencerfane.com

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Jean Hibray

| | |
|---|---|
| 500 Fast Cash | 515 G SE, Miami, OK 74354 |
| 500FastCash | 515 G SE, Miami, OK 74354 |
| 7 Day Services Limited | 40 East Main St, Suite 147, Newark, DE 19711 |
| Action Payday  LLC | PO Box 283, Flandreau, SD 57028 |
| Advance Me Today | 650 Naamans Rd, Suite 300, Claymont, DE 19703 |
| Advantage Cash Services (AMG) | 3531 P Street NW  Miami, OK 74354 |
| Affordable Loan Services | Clearlake Holdings, 621 Medicine Way, Suite 3, Ukiah, CA 95482 |
| American Web Loans | 112 Paradise Dr, Suite B., Red Rock, OK 74651 |
| Ameriloan (AMG) | 3531 P Street NW  Miami, OK 74354 |
| AMG OCS | 3531 P Street NW  Miami, OK 74354 |
| Arrow One  LLC | PO Box 648, Santa Ysabel, CA 92070 |
| Arrowhead Advance | PO Box 6048, Pine Ridge, SD 57770 |
| Baazing Loans  LLC | 100 Oceangate, Suite # 1100, Long Beach, CA 90802 |
| Bayside Loans | 23970 Pow Wow Trl, Watersmeet, MI 49969 |
| BD PDL Services  LLC | 603 West Broad Avenue, Flandreau, SD 57028 |
| Beacon | B. McCade Haderlie, 11901 4th St N, Suite 7201, St Petersburg, FL 33716 |
| BearPaw Finance  LLC | PO BOX 174, Finley, CA 95435 |
| Best Choice 123 | Clearlake Holdings, 621 Medicine Way, Suite 3, Ukiah, CA 95482 |
| Blue Horizon Loans | Clearlake Holdings, 621 Medicine Way, Suite 3, Ukiah, CA 95482 |
| Blue King | 46575 Road 417, Coarsegold, CA 93641 |

| | |
|---|---|
| BMG Group | 15 Turtle Drive, Wyandotte, OK 74370 |
| Camel Coin  Inc. | 2780 S. Jones Blvd #3695, Las Vegas, NV 89146 |
| Cash Banc | 40 East Main St, Suite 635, Neward, Delaware 19713 |
| Cash Central | 84 E. 2400 N., North Logan, UT 84321 |
| Cash Cure | Corp. Service Co., 251 Little Falls Dr, Wilmington, DE 19808 |
| Cash Direct Express (Lightsword) | 46575 Road 417, Coarsegold, CA 93641 |
| Cash Fairy | 25255 Cabot Road, Suite 208, Laguna Hills, CA 92653 |
| Cash For Me (DMA) | Darin Landau, 4475 S Pecos Rd, Las Vegas, NV 89121 |
| Cash In A Wink | 3422 Old Capitol Trail Suite 1109, Wilmington, DE 19808 |
| Cash Jar | PO Box 96503, #15050, Washington, D.C. |
| Cash on Web | Clearlake Holdings, 621 Medicine Way, Suite 3, Ukiah, CA 95482 |
| Cash Yes | PO Box 96503, #15050, Washington, D.C. |
| Castle Payday | 23970 Pow Wow Trl, Watersmeet, MI 49969 |
| CheckAdvanceUSA | 1 Wakpamni Lake Housing, Wakpamni Lake, SD 57716 |
| Clear-Loans.com | P.O. Box 3060, Trinidad, CA 95570 |
| Clearwater Lending  LLC | 25255 Cabot Road, Suite 208, Laguna Hills, CA 92653 |
| Click Media | 53 S. Main Street, Suite 300, Alpharetta, GA 30009 |
| Cover Me Cash | PO Box 388, Parshall, ND 58770 |
| Credit Payment Services | 4590 Deodar St, Silver Springs, NV 89429 |
| Fast EFENDS | 603 West Broad Avenue, Flandreau, SD 57028 |
| First Pay Loans | 1712 Pioneer Ave, Suite 294, Cheyenne, WY 82001 |

| | |
|---|---|
| FSST Financial Services LLC dba Aspen Peak Financial (APF) | 603 West Broad Avenue, Flandreau, SD 57028 |
| FSST Financial Services LLC dba North Plains Financial | 603 West Broad Avenue, Flandreau, SD 57028 |
| FSST Financial Services LLC dba Rushmore Financial | 603 West Broad Avenue, Flandreau, SD 57028 |
| Great Eagle Lending | 2726 Mission Rancheria Rd, Lakeport, CA 95453 |
| Green Gate Services | 600 F Street #721, Arcata, CA 95521 |
| Green Gates Servicing | 600 F Street #721, Arcata, CA 95521 |
| Integrity PDL Services LLC | 603 West Broad Avenue, Flandreau, SD 57028 |
| Lead Express Inc | 2780 S. Jones Blvd #3695, Las Vegas, NV 89146 |
| LendUp | 225 Bush St, Suite 1100, San Francisco, CA 94104 |
| Lion Loans | PO Box 1547, Sandy, UT 84091-1547 |
| Liquid Cash Online (Cyberclick) | 20801 Biscayne Blvd, 4th Fl, Aventura, FL 33180 |
| MB Marketing | 603 West Broad Avenue, Flandreau, SD 57028 |
| Money Key | 3422 Old Capitol Trail Suite 1613, Wilmington, DE 19808 |
| Multi Loan Source | Clearlake Holdings, 621 Medicine Way, Suite 3, Ukiah, CA 95482 |
| Nations Cash Online | Clearlake Holdings, 621 Medicine Way, Suite 3, Ukiah, CA 95482 |
| Northern Plains Funding | Stanley Chao, 32 Mulholland Dr, Woodcliff Lake, NJ 07677 |
| One Click Cash | 52946 Highway 12, Suite 3, Niobara, NE 68760 |
| Payday Accelerated | 1840 SW 22nd St, Suite 4-633, Miami, FL 33145 |
| Payday Loan Yes | 2015 Welsh Rd, D49, Philadelphia, PA 19115 |
| Pepper Cash | 23970 Pow Wow Trl, Watersmeet, MI 49969 |
| Preferred Cash Loans (AMG) | 3531 P Street NW Miami, OK 74354 |

| | |
|---|---|
| Red Leaf Ventures | 603 West Broad Avenue, Flandreau, SD 57028 |
| Red Stone Cash | 5201 Kingston Pike, Suite 6-361, Knoxville, TN 37919 |
| River Bend Cash | 3201 Summerhill Rd, Texarkana, TX 75503 |
| Safe Loans | 2400 Big Timber Rd, Suite 105 A, Elgin, IL 60123 |
| SCS Processing | 603 West Broad Avenue, Flandreau, SD 57028 |
| Sea Mirror  Inc | 1930 Wilshire Blvd, #400, Los Angeles, CA 90057 |
| Sierra Lending  LLC | PO Box 647, Santa Ysabel, CA 92070 |
| SignMyLoan | PO Box 5813, Wilmington, DE 19808 |
| Solomon Finance  Inc. | 1930 Wilshire Blvd, Suite 400, Los Angeles, CA 90057 |
| Sonic Cash | Pacific Registered Agents, Inc., 1805 N Carson St, Suite S, Carson City, NV 89701 |
| Sovereign Advance | PO Box 10, Parshall, ND 58770 |
| Star Cash Processing (AMG) | 3531 P Street NW  Miami, OK 74354 |
| Sure Advance | Registered Agents Legal Services, LLC, 1013 Centre Rd, Suite 403S, Wilmington, DE 19805 |
| Tall Grass Finance | PO Box 647, Santa Ysabel, CA 92070 |
| Target Cash Now | PO Box 581, Hays, MT 59527 |
| The Gan Eden Group | 1712 Pioneer Ave, Suite 294, Cheyenne, WY 82001 |
| United Cash Loans (AMG) | 3531 P Street NW  Miami, OK 74354 |
| US Fast Cash (AMG) | 3531 P Street NW  Miami, OK 74354 |
| VIP Cash | Darin Landau, 4475 S Pecos Rd, Las Vegas, NV 89121 |
| VIP PDL Services  LLC | 603 West Broad Avenue, Flandreau, SD 57028 |

| | |
|---|---|
| Vista B  LLC | 1048 W Cedar Rd, Kansas City, MO 64108 |
| West River Cash | 5201 Kingston Pike, Suite 6-361, Knoxville, TN 37919 |
| White Hills Cash | PO Box 330, Hays, MT 59527 |
| Zip Cash | The Corp. Trust Co., Corporation Trust Ctr, 1209 Orange St, Wilmington, DE 19801 |
| ZocaLoans | 27565 Research Park Dr, Mission SD 57555 |

Exhibit F



March 26, 2018


***VIA U.S. MAIL***

Mr. John Albanese, Esq.
Berger & Montague, P.C.
45 SE Main Street, Suite 505
Minneapolis, MN 55414

Re:     Subpoena to MoneyLion of Utah, LLC
          *Scott Rilley, Michelle Kunza, Linda Gonzalez, Michael Gonzales*
          *v.MoneyMutual, LLC, Selling Source, LLC, and PartnerWeekly, LLC*
          Court File No.: 0:16-cv-04001-DWF-LIB
          Subpoena Date: March 9, 2018
          Subpoena Production Date: March 30, 2018, 12:00 p.m.

Dear Mr. Albanese:

This office represents MoneyLion, Inc. and its affiliated entities (collectively, "MoneyLion"), including MoneyLion of Utah, LLC, which was served with a Production Subpoena dated March 9, 2018 ("Subpoena"), directed to "MoneyLion of Utah, LLC" in the above-referenced matter ("Action").

The Subpoena is the same document that your office previously mailed to a post office box. That prior subpoena was directed to "Lion Loans" and required production of documents at your office in Minneapolis. By letter dated December 4, 2017, we advised of various objections to the subpoena, including but not limited to the facts that:

     (i)      the subpoena was not directed to a proper entity,

     (ii)     that service did not conform to the requirements for service of a subpoena under Fed. R. Civ. P. 45, and

     (iii)    that the request to produce documents at your office in Minneapolis did not conform to Fed. R. Civ. P. 45(c)(2)(A), which requires that the place of production be "within 100 miles of where the person resides, is employed, or regularly transacts business."

While these infirmities have been corrected, the substance of our remaining objections have not been addressed. Accordingly, and pursuant to Fed. R. Civ. P. 45(d)(2)(B), MoneyLion asserts the following objections to the Subpoena:

**General Objections:**

1.   The Subpoena was served on MoneyLion on March 12, 2018, and requires MoneyLion to respond on March 30, 2018. Given the expansive nature of the items requested and the work required to

◆◆◆ **Moss & Barnett**

identify and produce responsive documents, if any, the Subpoena fails to allow a reasonable time for compliance.

2.  The Subpoena seeks information or documents that are overly broad, unduly burdensome, and not relevant in light of the District Court's August 30, 2017 order dismissing or partially-dismissing of many of the claims asserted in their First Amended Complaint, and are therefore beyond the scope of the Action and not relevant to plaintiffs' claims or any parties' defenses and are not proportional to the needs of the case, as required by Fed. R. Civ. P. 26(b)(1). MoneyLion objects to each request, to the extent that responding to such a request as written would be oppressive, unduly burdensome, excessively time consuming, or unnecessarily expensive.

3.  To the extent that the requests in the Subpoena purport to require information not related to the issues pending in the Action or are not reasonably calculated to lead to the discovery of admissible evidence or proportional to the needs of the Action, MoneyLion objects on the grounds that compliance would impose an undue burden or unnecessary expense

4.  Many of the requested documents should be available to Plaintiff via the named parties to the litigation, which further demonstrates the undue burden of the requests in the Subpoena. Likewise, the Subpoena is objectionable to the extent that it seeks information or documents possessed by persons other than MoneyLion or its personnel.

5.  The Subpoena seeks personal and private information related to the financial documents of non-parties to the Subpoena, thus possibly resulting in an impermissible third party disclosure.

6.  The Subpoena seeks information or documents that may be protected by or subject to federal or state privacy laws, including, but not limited to, the federal Fair Debt Collection Practices Act.

7.  The Subpoena as it calls for the production of nonpublic personal information ("NPI") and that such NPI may not be disclosed absent a court order, or other judicial process, as per the Graham Leach Bliley Act.

8.  The Subpoena seeks information or documents that are private, proprietary, trade secret or otherwise confidential. Responses related to such information will not be given unless deemed confidential pursuant to any protective order entered by the Court.

**OBJECTIONS TO SPECIFIC REQUESTS:**

**Request No. 1:** This request essentially requires the non-party witness to first review all *"loan agreements with Minnesota residents consummated at any time since August 1, 2009,"* and then to further break those down to identify any *"initiated through or facilitated by a lead purchased"* from one of the defendants. It imposes a substantial burden on the responding non-party to review tens of thousands of documents in the first instance to verify those applying to Minnesota residents, and then make a separate determination as to how they may have been *"initiated or facilitated"*, let alone if by the named defendants. That search would literally require scores of person-hours to conduct. It is not clear how this request is even intended to lead to the discovery of admissible

◆◆◆ **Moss & Barnett**

evidence is relevant to plaintiffs' claims in the Action. However, it is quite clear that the request imposes an enormous burden and expense on the non-party to whom the Subpoena is directed.

**Request No. 2:** This request builds off the laborious identification process in Request No. 1, and requires the non-party to then research and produce "*the payment history for every [such] loan transaction*" during the same 8 1/2 year period, as well as the "*consumer's bank and bank account number.*" The time required just to review records and identify – let alone segregate, summarize and produce all requested payment history and account records -- could easily equal the time necessary to respond to Request No. 1. Moreover, how is the payment history and account information for a non-party's loan transactions reasonably calculated to lead to the discovery of admissible evidence in the Action or otherwise proportionate to the needs of the Action?

**Request No. 3:** This request seeks "*agreements or contracts with companies to which you furnish information regarding loans for the purposes of credit reporting or collection,*" again over the same 8 1/2 year period. Any contracts or agreements that the non-party has with any credit reporting and collection entities have utterly no relevance to the remaining claims of the plaintiffs' in this Action. Accordingly, this request is oppressive and unduly burdensome, and not reasonably tailored to lead to the discovery of admissible evidence in the Action, nor proportionate to the needs to the case.

**Request No. 4:** This request seeks any contracts that may exist between any of the three defendants and the subpoenaed party. Such contracts, to the extent they may exist, are available from the three defendants. Accordingly, to request a non-party to search for and identify "*any contracts*" with the named defendants is unreasonable, and imposes an unnecessary burden to identify and produce any such contracts.

**Request No. 5:** Request 5, which seeks any "communications" that the subpoenaed non-party may have had with any of the defendants over an 8 1/2 year period concerning a broad range of topics, is patently overbroad and imposes an undue burden on the subpoenaed non-party. The range of topics covered in such communications as set out in this request is numerous, vague and ill-defined. It would require hundreds of person-hours to review written correspondence, emails, phone logs and other documents or records constituting a "communication" over this 8 1/2 year period just to identify if it involved any of the defendants let alone whether it was responsive to the broad scope of the request. Furthermore, the six categories of topics of communication are very broad and ill-defined. For example, how is a nonparty to determine what documents of communications with the named defendants "*relat[e] to this lawsuit,*" or MoneyLion's "*legal status as a lender,*" or "*complaints regarding loans*"? Moreover, how do these six categories of documents have any discernible relevance to the claims asserted by plaintiffs in the Action? Accordingly, this request is not reasonably tailored to lead to the discovery of admissible evidence in the Action or proportional to the needs of the Action.

**Request No. 6:** This request is burdensome inasmuch as records of any "*lending licenses*" issued by the state of Minnesota are available to Plaintiff on-line or through the state.

**Request No. 7:** This request, for "*agreements with any payment processors or banks used that you have used to initiate ACH transactions on your behalf Minnesota borrowers*" over the same 8 1/2

**◆◆◆ Moss & Barnett**

year period, has no discernible application to the claims of Plaintiffs in the Action and, therefore, is not reasonably calculated to lead to the discovery of admissible evidence in the Action, nor is it proportionate to the needs of the case. It is thus unduly burdensome on the non-party. Moreover, this request improperly seeks proprietary and confidential information relating to a non-party's financial and banking relationships.

By making the above general and specific objections, MoneyLion is not suggesting or implying in any way that it has information or documents responsive to the Subpoena. MoneyLion expressly reserves the right to assert additional general and specific objections to the Subpoena, as appropriate, and to amend or supplement these objections or its response.

Finally, as you were previously advised respect to the December 2017 subpoena, your office is required to take "*reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena*", per Fed. R. Civ. P. 45(d)(1). Accordingly, unless the Subpoena is withdrawn or in the event that your office seeks to enforce this Subpoena, MoneyLion reserves its right to seek its reasonable attorney's fees and costs, on the grounds that the Subpoena was issued in violation of the requirements of Fed. R. Civ. P. 45, and that it is both without merit, unduly burdensome, and vexatious.

Please direct all future communications regarding the Subpoena to my attention.

Very Truly Yours,

Moss & Barnett

Michael S. Poncin
150 South Fifth Street
Suite 1200
Minneapolis, MN 55402
612-877-5290
Mike.poncin@lawmoss.com

# Exhibit G



John G. Albanese

**WRITER'S DIRECT DIAL** | 612-594-5997

**WRITER'S DIRECT FAX** | 612-584-4470

**WRITER'S DIRECT E-MAIL** | jalbanese@bm.net

April 4, 2018

**<u>VIA EMAIL</u>**
Michael S. Poncin
Moss & Barnett
150 South Fifth Street, Suite 1200
Minneapolis, MN 55402
mike.poncin@lawmoss.com

> **RE:    Production Subpoena to MoneyLion of Utah LLC,** *Rilley v. MoneyMutual,*
> *LLC***, Case No. 16-cv-04001-DWF/LIB (D. Minn.)**

Mike,

I am in receipt of MoneyLion's objections to Plaintiffs' Subpoena.  I am writing in the hopes that
we can resolve this matter without the need for court intervention.

As you may recall, we previously served your client with an identical subpoena on November 7,
2017.  Your client had numerous objections to that subpoena which you served on December 4,
2017.  On December 21, 2017, you and I discussed your client's objections and you agreed to go
back to your client to see what documents your client had available.  After various follow ups, I
never received a response.  To alleviate some of the potential issues that MoneyLion raised with
Plaintiffs' original subpoena, Plaintiffs re-served the amended Subpoena on March 12, 2018.

MoneyLion has objected to Plaintiffs' requests on burden and relevancy grounds.  As I explained
on our call, Plaintiffs believe that all of the requests seek relevant information, and do not believe
that any of the requests pose an undue burden.

In a final effort to attempt to resolve this matter, if MoneyLion agrees to produce information by
May 1, 2018, Plaintiffs are willing to limit their Subpoena to seek only the documents identified
in Request Nos. 1 and 2.  Further, with respect to Request No. 2, MoneyLion would not be required
to "include sufficient information to identify the consumer's bank and bank account number
involved in the loan transaction."  If MoneyLion is willing to agree to be bound in writing to the
protective order issued in this case, I can provide MoneyLion with a list of the Minnesota
borrowers for whom Plaintiffs seek loan documents and transaction histories, along with an
approximate date of when the borrower would have consummated a loan transaction with
MoneyLion.

To briefly reiterate the relevance of this information, in this case, Defendants are alleged to have
operated a lead generation business that sells consumer leads to online lenders, including
MoneyLion.  As I explained in our telephone call, one of the claims in this case is that Defendants
arrange for loans with lenders that violate various aspects of Minnesota law.  Defendants have

represented that they do not track whether a loan is eventually consummated, nor are Defendants aware of the specific terms of any consummated loan. The terms of the loan agreements and the payments made on the loans are relevant to both liability and damages in this case.

I am available to meet and confer regarding these issues any time before 12:00 PM on Thursday, April 5, and between 10:00 AM and 2:00 PM on Friday, April 6. I am also available to speak on Friday, April 13 at any time between 10:00 AM and 3:00 PM.

Should MoneyLion not accept the compromise proposed above, Plaintiffs reserve all rights to seek all documents requested by the Subpoena through an enforcement proceeding.

Sincerely,

John Albanese

John Albanese

Exhibit H



Loans    Finances                    Community        Products        🔔 0            Jonathon       🔔 0          ☰

MoneyLion                              Credit                                                                              0

(/)                    (/loans)    (/finances)        (/community)     (/products)     (/alerts)       A. ▾          (/alerts)

LL Redacted           PAID OFF  ❷                      Loan Amount: $300        **Have Questions?**
Issued Jan 10, 2017                                    Loan documents
                                                                                Check out our **FAQ**
📅  **Payment Schedule**                                          ✖ ⏷          **(https://support.moneylion.com)** or email us
                                                                                at **support@moneylion.com**
                                                                                **(mailto:support@moneylion.com)**. We
✔ $71.98 $71.98 $71.98 $71.98 $71.98 $71.98 $71.98 $71.98 $71.98 $71.98 $71.98 $71.98 $74.98 $71.75    typically respond within 24 hours during
                                                                                business hours.
1/20   2/3   2/17   3/3   3/16   3/30   4/13   4/27   5/11   5/25   6/8   6/22  7/6

✚  **Show loan history**

                                                                                Home                 FAQ
                                                                                (https://www.moneylion.com)  (https://support.moneylion.co...

                                                                                Advertiser Disclosure          Contact
                                                                                (https://www.moneylion.com/legal#ad)  (mailto:support@m...

                                                                                [f]                  [🐦]
                                                                                (https://www.facebook.com/moneylion)  (https://twitter.co...

PLF-0002538

Home (https://www.moneylion.com)    FAQ (https://support.moneylion.com)    Privacy Policy (https://www.moneylion.com/legal#mpp)
Terms & Conditions (https://www.moneylion.com/legal#tnc)    Contact (mailto:support@moneylion.com)
◼ (https://www.facebook.com/moneylion)    ◼ (https://twitter.com/moneylion)    ◼
(https://www.linkedin.com/company/moneylion)    ◼
(https://plus.google.com/100864216226929554903/about?hl=en)